IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| IGLESIA PUERTA DEL CIELO, INC., | § | CASE NUMBER - 13-31911-rbk |
| | § | |
| Debtor. | § | |

---

## DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF DEBTOR'S PLAN OF REORGANIZATION

---

### DATED NOVEMBER 14, 2013

**IMPORTANT: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. AT THIS TIME, THIS DISCLOSURE STATEMENT IS NOT BEING PROVIDED TO YOU WITH THE INTENT TO SOLICIT YOUR VOTE OR ACCEPTANCE OF ANY PLAN OF REORGANIZATION. THE DISCLOSURE STATEMENT IS MERELY BEING PROVIDED TO YOU AS A PART OF THE DISCLOSURE STATEMENT APPROVAL PROCESS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3017.**

**[PAGE TO BE REMOVED AFTER DISCLOSURE STATEMENT APPROVED.]**

Wiley F. James, III
Texas State Bar No. 10554300
James & Haugland, P.C.
609 Montana Ave.
El Paso, Texas  79902
Telephone:  (915) 532-3911
Facsimile :  (915) 541-6440
E-mail     :  wjames@jghpc.com

November 14, 2013

## TABLE OF CONTENTS

NOTICE ............................................................................................. 1

PLAN SUMMARY ............................................................................. 1
I.      INTRODUCTION ....................................................................... 2
        A.      Filing of the Debtors' Chapter 11 Bankruptcy Cases ...................... 2
        B.      Purpose of the Disclosure Statement ...................................... 2
        C.      Hearing on Confirmation of the Plan ...................................... 3
        D.      Sources Information ...................................................... 4
II.     OVERVIEW OF CHAPTER 11 ........................................................ 4
        A.      Overview of Chapter 11 ................................................... 4
        B.      Plan of Reorganization ................................................... 5
III.    VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION .... 6
        A.      Person Entitled to Vote .................................................. 6
        B.      Voting Instructions ...................................................... 7
                1. Voting Record Date....................................................... 7
                2. Deadline for Submission of Ballots....................................... 7
                3. Incomplete or Irregular Ballots ......................................... 8
                4. Ballot Retention ........................................................ 8
        C.      Confirmation of Plan ..................................................... 8
                1. Solicitation of Acceptances.............................................. 8
                2. Requirements for Confirmation of the Plan................................ 9
                3. Acceptances Necessary to Confirm the Plan.............................. 10
                4. Cramdown .............................................................. 10
                5. Absolute Priority Rule................................................. 11
IV.     BACKGROUND OF DEBTOR AND EVENTS LEADING TO BANKRUPTCY . 11
        A.      History of the Debtor .................................................. 11
        B.      Background of the Debtor's President ................................... 13
        C.      Management's Discussion of the Events Leading to Bankruptcy ............ 13
        D.      Goal of the Debtor's Bankruptcy Cases .................................. 13
V.      POST-PETITION OPERATIONS AND SIGNIFICANT ORDERS AND EVENTS 13
        A. Post-Petition Operations .................................................. 13
        B. Significant Orders and Events During the Debtor's Bankruptcy Case ......... 14
                1. Employment of Professionals........................................... 14
                2. Meeting of Creditors and Claims Bar Dates............................. 14
                3. Administration of Case/First Day Pleadings............................ 14
VI.     ASSETS AND LIABILITIES OF THE DEBTOR ........................................ 15
        A. Overview of the Debtor's Assets and Liabilities ........................... 15
        B. Claims Asserted Against the Debtor ........................................ 15
        C. Estimated Allowed Claims and Estimated Recoveries ........................ 16
        D. Monies Raised Through Bankruptcy Cases ................................... 17
        E. Estimated Professional Fees and Reorganization Costs ..................... 17

    F.  Preference and Other Avoidance Litigation and Estate Actions . . . . . . . . . . . . . . . . 17
VII.  **OVERVIEW OF THE PLAN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    A.  Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    B.  Classification of Claims and Interests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        1.  Classification . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . 23
        2.  Identification of Classes.. . . . . . . . . . . . . .. . . . . . . . . . . .. . . . . . . . . . 23
        3.  Unimpaired Classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        4.  Impaired Classes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
    C.  Treatment of Allowed Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        1.  Class 1 - Secured Tax Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        2.  Class 2 - Secured Claims of Evangelical Christian Credit Union ("ECCU"). . . .
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        3.  Class 3 - Secured and Allowed Claims of Isaac Group Lenders . . . . . . . .. . 25
        4.  Class 4 - Secured and Allowed Claims of Judgment Creditors. . . . . . . . . . .27
        5.  Class 5 - Secured and Allowed Claim of Rodriguez-Herrera. . . . . . .. . . . . 28
        6.  Class 6 - General Unsecured Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        7.  Class 7 - Subordinated and Penalty Claims. . . . . . . . . . . . . . . . . . . . . . . . 30
        8.  Class 8 - Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        9.  Establishment of Contested - Claim Reserve . . . . . . . . . . . . . . . . . . . . . . 31
    D.  Treatment of Allowed Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        1.  Treatment of Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
        2.  Payment of Statutory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    E.  Objections to Claims and Interests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        1.  Objection Deadline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        2.  Prosecution of Objections and Estate Actions. . . . . . . . . . . . . . . . . . . . . . 33
    F.  Provisions Governing Executory Contracts and Unexpired Leases Under the Plan  . 33
        1. Assumption of Certain Contracts; Rejected if Not Assumed. . . . . . . . . . . . . 33
        2.  Bar to Rejection Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
        3.  Insurance Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        4.  Timing of Cure Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    G. Miscellaneous Provisions of the Plan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        1.  Setoff and Other Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
        2.  Discharge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        3.  Injunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        4.  Payment of Judgement from Bankruptcy Court. . . . . . . . . . . . . . . . . . . . . 36
        5.  Exculpation and Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        6.  Lawsuits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
        7.  Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
        8.  Post-Effective Date Fees and Expenses of Professional Persons . . . . . . . . . 37
        9.  Bankruptcy Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
        10.  Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
        11.  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
        12.  Modification or Revocation of Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        13.  Creditor Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        14.  Debtor' Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

15. Disallowance and Subordination of Subordinated Claims and Penalty Claims
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . 39
16. Release of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
17. Prohibition on Nonvoting Equity Securities . . . . . . . . . . . . . . . . . . . . . . . 39
18. Integration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
19. Retention of Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 39
20. Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . 39
21. Notice to the Reorganized Debtor . . . . . . . . . . . . . . . . . . . . . . . . . 40
22. Substantial Consummation/Closing the Case.. . . . . . . . . . . . . . . . . . . . . . . . .40

VIII. **MEANS FOR EXECUTION OF THE PLAN** . . . . . . . . . . . . . . . . . . . . . . . 40
A. Powers and Duties of the Reorganized Debtor with Respect to Consummation of
the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
B. Sale of Unimproved Land. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
C. Officers and Managers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
D. Vesting of Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
E. Corporate Purpose of the Reorganized Debtor . . . . . . . . . . . . . . . . . . . . . . . 43
F. Assumption of Liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
G. Contested Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
1. Establishment of Contested-Claim Reserve.. . . . . . . . . . . . . . . . . . . . . . . .43
2. Determination of Contested-Claim Reserve.. . . . . . . . . . . . . . . . . . . . . . . .43
3. Return of Assets.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
4. Withholding of Taxes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
H. Estimated Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
I. Powers and Duties of the Reorganized Debtor with Respect to Consummation of the
Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
J. Provisions Governing Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
1. Date of Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 44
2. Means of Cash Payment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
3. Delivery of Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
4. Time Bar to Cash Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
5. No Distributions Pending Allowance. . . . . . . . . . . . . . . . . . . . . . . . . . . .45
6 Distributions After Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
7. Distributions After Disallowance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
8. Exculpation Regarding Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
9. De Minimis Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46
K. Conditions Precedent to Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . .46
1. Conditions Precedent to Effective Date of the Plan. . . . . . . . . . . . . . . . . . 46
Waiver of Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . .46
L. Retention of Bankruptcy Court Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . 46
1. Scope of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . 46
2. Failure of the Bankruptcy Court to Exercise Jurisdiction. . . . . . . . . . . . . . . .48
IX. **FEASIBILITY AND RISKS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
A. Management's Discussion of Financial Projections . . . . . . . . . . . . . . . . . . . . 48
B. Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
1. Certain Risks of Non-Confirmation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

|  |  | 2. Potential Effects of a Prolonged Chapter 11 Proceeding. . . . . . . . . . . . . . . . 49 |
|  |  | 3. Risks Relating to the Projections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 50 |
|  |  | 4. Capital Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . 50 |
|  |  | 5. Forward-Looking Information May Prove Inaccurate . . . . . . . . . . . . . . . . . 50 |
|  |  | 6. Competition and Economic Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 |
|  |  | 7. Other Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51 |
| X. | ALTERNATIVES TO PLAN | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51 |
|  | A. Liquidation Analysis | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51 |
|  | B. Strategic Purchasers or Investors | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54 |
|  | C. Other Alternative Plans | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54 |
| XI. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF |  |
|  | THE PLAN | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54 |
|  | A. Federal Income Tax Consequences to the Debtor | . . . . . . . . . . . . . . . . . . . . 55 |
|  |  | 1. In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55 |
|  |  | 2. Treatment of Debt Discharge Income Under the Plan . . . . . . . . . . . . . . . . 55 |
|  | B. Federal Income Tax Consequences to Creditors | . . . . . . . . . . . . . . . . . . . . . 56 |
|  |  | 1. In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56 |
|  |  | 2. Payments Attributable to Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56 |
|  |  | 3. Backup Withholding and Information Reporting . . . . . . . . . . . . . . . . . . . .57 |
|  | C. Federal Income Tax Consequences to Interest Holders | . . . . . . . . . . . . . . . . . . . 57 |
| XII. | MISCELLANEOUS PROVISIONS | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57 |
|  | XIII.   CONCLUSION | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57 |

November 13, 2013

WILEY F. JAMES, III
JAMES & HAUGLAND, P.C.
COUNSEL FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION

## NOTICE

**AFTER NOTICE AND HEARING ON _____, 2013. AFTER NOTICE AND A HEARING, THE COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT DETAIL ADEQUATE TO ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF THE CLASSES OF CLAIM HOLDERS AND INTEREST HOLDERS ENTITLED TO VOTE PURSUANT TO THE PLAN TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE**

## PLAN SUMMARY

On November 12, 2013(the "Petition Date"), Iglesia Puerta Del Cielo, Inc. (the "Debtor") filed a voluntary petition under chapter 11 of Title II of the United States Code (the " filed voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, El Paso Division (the "Court"). The Debtor has proposed a Plan of Reorganization (the "Plan"), dated November 14, 2013, (the "Plan") for the benefit of the creditors of the Debtor.

All holders of Claims or interests are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, which is attached hereto as Exhibit A. The Debtor believes that the Plan is in the best interests of all holders of Claims. Voting instructions regarding the Plan are provided (i) in this Disclosure Statement, (ii) in the Order approving the Disclosure Statement, and (iii) in the Ballots enclosed herewith. The Plan can only be confirmed if at least one voting Class of Claims votes in favor of the Plan.

The plan pays all administrative and priority Claims on the Effective Date. Secured Creditors Isaac Group Lender, Judgment Creditors and Rodriguez-Herrera will be paid in full through the return of the collateral securing their debt, to wit a sixteen (16) acre parcel of unimproved property adjacent to the Church. General Unsecured Creditors will be paid in full not later than thirty-six (36) months after the Effective Date. Finally, Secured Creditor Evangelical Christian Credit Union ("ECCU") will be paid in full per the payment plan set forth in the Plan of Reorganization Confirmed on June 29, 2010 in a prior Chapter 11 case filed by the Debtor.

The Debtor estimates that there will be no funds available to Allowed General Unsecured Claims if the Plan is not accepted by the requisite Class(es) of creditors and confirmed by the Court.

## I.  INTRODUCTION

### A.  Filing of the Debtors' Chapter 11 Bankruptcy Cases

The Debtor filed a voluntary petitions under the Bankruptcy Code on November 12, 2013. The Debtor's reorganization case (the "Bankruptcy Case") is pending in the United States Bankruptcy Court for the Western District of Texas, El Paso Division, before Honorable H. Christopher Mott, United States Bankruptcy Judge. Since the Petition Date, the Debtor has operated its business as Debtor-in-Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.  Purpose of the Disclosure Statement

This Disclosure Statement is submitted by the Debtor pursuant to section 1125 of the Bankruptcy Code in connection with the Debtor's Plan. A copy of the Plan is attached to this Disclosure Statement as Exhibit A. For purposes hereof, any term used in this Disclosure Statement (regardless of capitalization), and not otherwise separately defined herein, shall have the defined meaning ascribed to it in the Plan, or, if not defined in the Plan, then in section 101 of the Bankruptcy Code. As used herein, "Reorganized Debtor" means Iglesia Puerta Del Cielo, Inc., on and after the Effective Date of Confirmation of the Plan.

On_____, 20__ after notice and a hearing, the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the Classes of Claim holders and Interest holders entitled to vote pursuant to the Plan to make an informed judgment on whether to accept or reject the Plan. The Court's approval of this Disclosure Statement does not constitute an endorsement of the Plan. Approval does indicate, however, that the Court has determined that the Disclosure Statement meets the requirements of section 1125 of the Bankruptcy Code and contains adequate information to permit the holders of Allowed Claims, whose acceptance of the Plan is solicited, to make an informed judgment regarding acceptance or rejection of the Plan.

**IT IS OF UTMOST IMPORTANCE THAT YOU READ THIS DISCLOSURE STATEMENT IN FULL AND IN CONJUNCTION WITH THE PLAN AND GLOSSARY ATTACHED HERETO.**

**OTHER THAN THIS DISCLOSURE STATEMENT, NO STATEMENT OR INFORMATION GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTION OF THE PLAN HAS BEEN APPROVED BY THE BANKRUPTCY COURT CONCERNING (1) THE DEBTOR AND ITS BUSINESS, ASSETS OR PROPERTY; (2) THE REORGANIZED DEBTOR AND THE PROJECTED RESULTS OF ITS FUTURE BUSINESS OPERATIONS AND FINANCIAL CONDITION; OR (3) DISTRIBUTIONS TO BE MADE UNDER THE PLAN THAT IS AUTHORIZED. YOU SHOULD USE CAUTION IN CONSIDERING ANY STATEMENT OR INFORMATION IN MAKING YOUR VOTING DECISION BASED UPON INFORMATION NOT CONTAINED HEREIN.**

THE STATEMENTS AND THE FINANCIAL INFORMATION ABOUT THE DEBTOR AND/OR THE REORGANIZED DEBTOR, INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS AND INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM THE DEBTOR'S BOOKS AND RECORDS. WHILE THE DEBTOR BELIEVES THE INFORMATION TO BE ACCURATE AND COMPLETE, THE DEBTOR AND ITS PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIM ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTOR AND THE REORGANIZED DEBTOR AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATED AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. *SEE* "ARTICLE IX - FEASIBILITY AND RISKS." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.

C.    Hearing on Confirmation of the Plan

The Court has set the confirmation Hearing for _____, 2014 at _____ a.m., Mountain Time, in the courtroom of the Honorable Ronald B. King, Chief United States Bankruptcy Judge for the Western District of Texas, El Paso Division, located at 511 E. San Antonio, Room 444, El Paso, Texas 79901. The Confirmation Hearing may be adjourned by the Court from time to time without further notice other than an announcement made in open court at the Confirmation Hearing or any continued hearing thereon.

D.    Sources Information

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its business, properties, and management, and the Plan have been prepared from information furnished by the Debtor.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents. While the Debtor has made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtor urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall apply.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date thereof.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the holder of a Claim or Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representation or inducements should be reported to counsel for the Debtor:

> Wiley F. James, III
> Texas State Bar No. 10554300
> James & Haugland, P.C.
> 609 Montana Ave.
> El Paso, Texas 79902
> Telephone: (915) 532-3911
> Facsimile : (915) 541-6440
> E-mail    : wjames@jghpc.com

## II.    OVERVIEW OF CHAPTER 11

A.    Overview of Chapter 11

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code. Upon the commencement of a Chapter 11 case, section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect upon claims against a debtor that arose prior to the bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Page 4 of 59

Under Chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor and its creditors. Confirmation of a plan of reorganization is the primary purpose of a reorganization case under Chapter 11 of the Bankruptcy Code.

B.    <u>Plan of Reorganization</u>

A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Generally, a claim against a debtor arises from a normal debtor/creditor transaction such as a promissory note or a trade-credit relationship, but may also arise from other contractual arrangements or from alleged torts. An interest in the debtor is held by a party that owns all or part of the debtor, such as a shareholder or partner.

After a plan of reorganization has been filed with a bankruptcy court, it must be accepted by holders of impaired claims against, or interests in, the debtor. Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose sufficient information about the debtor, its assets, and the plan of reorganization to claim holders and interest holders before acceptances of that plan may be solicited. This Disclosure Statement is being provided to the holders of Claims against, or Interests in, the debtor to satisfy such requirements of section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that claim holders and interest holders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class. While courts have disagreed on the proper method to be used in the classifying claim holders and interest holders, a general rule of thumb is that claim holders with similar legal right are placed together in the same class and that interest holders with similar legal rights are placed together in the same class. For example, all claim holders entitled to priority under the Bankruptcy Code might be placed in one class, while all claim holders holding subordinated unsecured claims might be placed in a separate class. Generally, each secured creditor will be placed in a class by itself because each such creditor usually has a lien on distinct legal rights.

The Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan for the Court to confirm the Plan. Rather, the Plan must be accepted by each *Class* of holders of Claims or Interests (subject to an exception discussed below and in Article III.C.4.). A Class of holders of Claims or Interests accepts the Plan if, of the Claims in the Class that actually voted on the Plan, such Claims constituting at least two-thirds in dollar amount and more than one-half in number of Allowed Claims are voted in favor of the Plan, such Claims constituting at least two-thirds in dollar amount and more than one-half in number of Allowed Claims are voted in favor of the Plan. For example, if a hypothetical class has ten claims that are voted and the total dollar amount of those ten claims is $1,000,000, then for such class to have accepted the plan, six or more of those claims must be voted to accept the plan (a simple majority), and the claims voted to accept the plan must total at least $666,667 (a two-thirds majority).

The Court many confirm the Plan even though fewer than all Classes of Claims and Interests vote to accept the Plan. In this instance, the Plan must be accepted by at least one "impaired" Class of Claims, without including any acceptance of the Plan by an Insider. Section 1124 of the

Bankruptcy Code defines "impairment" and generally provides that a claim is "impaired" if the legal, equitable and contractual rights to which such claim or interest is entitled is altered in any fashion.

Independent of the acceptance of the Plan as described above, to confirm the Plan the Court must determine that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See below, "Voting Procedures and Requirements for Confirmation," Article III, for a discussion of the section 1129(a) requirements for confirmation of a plan of reorganization.

**THE DEBTOR BELIEVES THAT THE PLAN SATISFIES EACH OF THE CONFIRMATION REQUIREMENTS OF SECTION 1129(a) AND, IF NECESSARY, SECTION 1129(b) OF THE BANKRUPTCY CODE.**

Confirmation of the Plan makes the Plan binding upon the Debtor, the Reorganized debtor, Claim holders, Interest holders and other parties in interest irrespective of whether they have filed proofs of Claim or voted to accept the Plan.

## III.   VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION

If you are the holder of a Claim or Interest in one of the Classes whose rights are affected by the Plan, it is important that you vote. If you fail to vote, your rights may be jeopardized.

### A.   Person Entitled to Vote

Pursuant to the provisions of section 1126 of the Bankruptcy Code, only holders of Claims of Interests that are (i) Allowed (ii) impaired, and (iii) receiving or retaining property on account of such Claims pursuant to the Plan, are entitled to vote either for or against the Plan ("Voting Claims"). Accordingly, in this Bankruptcy Case, any holder of a Claim or Interest classified in Classes 2 and 6 of the Plan may have a Voting Claim and should have received a Ballot for voting (with return envelope) along with this Disclosure Statement Plan, and other materials because these are the only Classes consisting of impaired Claims that are receiving property. Under the Bankruptcy Code, Classes, such as Classes 7 and 8 under the Plan, that do not receive any property under the Plan as payment of the Claims or Interests are deemed to have rejected the Plan and are not entitled to vote. Those Classes are presumed to vote to reject the Plan and, therefore, votes from such Classes are not solicited.

As referenced in the preceding paragraph, a Claim must be Allowed to be a Voting Claim. The Debtor filed the Schedules in its Bankruptcy Case listing Claims against the Debtor. To the extent a creditor's Claim was listed in the Debtor's Schedules, and was not listed as disputed, contingent, or unliquidated, such Claim is deemed "Allowed." Any creditor whose Claim was not scheduled, or was listed as disputed, contingent, or unliquidated, must have timely filed a proof of Claim in the Debtor's case in order to have an Allowed Claim against such Debtor.

The last day for holders of Claims to file its Claims for amounts owed prepetition against the Debtor, is March 11, 2014. This date constitute the "Claims Bar Date" for the Debtor. Claims not

filed by the applicable Claims Bar Date are forever barred and discharged.

Absent an objection to a timely filed proof of Claim by the Objection Deadline, such Claim is deemed Allowed. In the event that any proof of Claim is a Contested Claim during the plan voting period, then, by definition, it is not Allowed for purposes of section 1126 of the Bankruptcy Code, and is not to be considered a Voting Claim entitled to cast a Ballot. Nevertheless, pursuant to Bankruptcy Rule 3018(a), the holder of a Contested Claim may petition the Bankruptcy Court, after notice and hearing, to allow the Claim temporarily for voting purposes in an amount that the Bankruptcy Court deems proper. Allowance of a Claim for voting purposes, and disallowance for voting purposes, does not necessarily mean that all or a portion of the Claim will be Allowed or disallowed for distribution purposes.

BY ENCLOSING A BALLOT, THE DEBTOR IS NOT REPRESENTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN. BY INCLUDING A CLAIM AMOUNT ON THE BALLOT (IF APPLICABLE), THE DEBTOR ARE NEITHER ACKNOWLEDGING THAT YOU HAVE AN ALLOWED CLAIM IN THAT AMOUNT NOR WAIVING ANY RIGHTS SUCH DEBTOR MAY HAVE TO OBJECT TO YOUR VOTE OR CLAIM.

If you believe you are a holder of a Claim in an impaired Class under the Plan and entitled to vote to accept or reject the Plan, but did not receive a Ballot with these materials, please contact Wiley, F. James, III, James & Haugland, P.C., 609 Montana Ave., El Paso, Texas 79902, Telephone: 915-532-3911, E-mail: wjames@jghpc.com.

> B.    Voting Instructions

If you are a holder of a Voting Claim, your vote on the Plan is important. Please read the voting instructions carefully and return your Ballots as specified below and on the Voting Instructions contained in and attached to your Ballots.

> *1. Voting Record Date*

Pursuant to Bankruptcy Rule 3017(d) _____, 2014, is the "Voting Record Date" for determining which creditors may be entitled to vote to accept or reject the Plan. Only holders of record of Allowed Claims against, or Allowed Interests in, the Debtor on the Voting Record Date are entitled to cast Ballots.

> *2. Deadline for Submission of Ballots*

BALLOTS MUST BE ACTUALLY RECEIVED BY THE DEBTOR'S COUNSEL, WHETHER BY MAIL, COURIER, OR FACSIMILE ON OR BEFORE _____, 2014. ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT THAT IS NOT EXECUTED A PERSON AUTHORIZED TO SIGN SUCH BALLOT WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN OR YOU DID NOT RECEIVE OR NEED A REPLACEMENT BALLOT, CONTACT WILEY F. JAMES, III, JAMES & HAUGLAND, P.C., 609 MONTANA AVE., EL PASO, TEXAS 79902, TELEPHONE: (915)532-3911, E-MAIL: WJAMES@JGHPC.COM. THE DEBTOR URGES ALL HOLDERS OF VOTING CLAIMS TO VOTE IN FAVOR OF THE PLAN.

### 3. Incomplete or Irregular Ballots

Ballots that fail to designate the Class to which they apply will be counted, subject only to contrary determination by the Court, in the Class determined by the Debtor. The Debtor's counsel will use his best judgment in the determination of votes; however, Ballots that do not reflect acceptance or rejection, or reflect both acceptance and rejection of the Plan for a single Claim may not be counted.

### 4. Ballot Retention

Original ballots will be retained by the Debtor's counsel for six months following the Confirmation Date, afer which they may be destroyed at the discretion of the Debtor's counsel.

### C.    Confirmation of Plan

### 1. Solicitation of Acceptances

The Debtor is soliciting your vote. The cost of any solicitation by the Debtor will be borne by the Debtor. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

NO REPRESENTATION OR ASSURANCES, IF ANY, CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE THAT ARE OTHER THAN HEREIN CONTAINED SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

**THIS IS A SOLICITATION SOLELY BY THE DEBTOR AND IS NOT A SOLICITATION BY ANY OFFICER, DIRECTOR, MANAGER, MEMBER, SHAREHOLDER, ATTORNEY, FINANCIAL ADVISOR, OR ACCOUNTANT FOR THE DEBTOR. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF SUCH OFFICERS, DIRECTORS, MANAGERS, MEMBERS, SHAREHOLDERS, ATTORNEYS, FINANCIAL ADVISORS, OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claim holder has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. The solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code. Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowances of any improperly solicited vote.

### 2. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. If those requirements have been satisfied, the Court will enter the
Confirmation Order. The requirements for confirmation under the Bankruptcy Code are as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or promised by the proponent of the Plan or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the Plan and incident to the Bankruptcy Case, was disclosed to the Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable.
- The proponent of the Plan has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as director, officer or voting trustee of the Debtor, any affiliate of the Debtor participating in a plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or the continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy.
- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized debtor and the nature of the compensation for such Insider.
- Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.
- With respect to each Class of impaired Claims, either each holder of a Claim in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount such Claim holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code.
- Subject to the Plan proponent's "cramdown" right described in Article III.C.4 of this Disclosure Statement, which follows, each Class of Claims or Interests has either

accepted the Plan or is not impaired under the Plan.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims will be paid in Cash in full on the Effective Date and that any tax Claim entitled to priority under section 507(a)(7) is being paid in full in deferred cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.
- At least one impaired Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in such Class.
- Confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.
- All fees payable under 28 U.S.C. § 1930 have been paid (or the Plan has provided for payment of such fees) on the effective date of the Plan.
- The Plan provides for continuation after its Effective Date of retiree benefits for the duration of the period the Debtor has obligated itself to provide such benefits.

The Debtor believe that the confirmation requirements applicable to the Bankruptcy Case are met under the Plan. The Debtor will present evidence in support of each applicable requirement at the Confirmation Hearing.

### 3. Acceptances Necessary to Confirm the Plan

The Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan for the Court to confirm the Plan. Rather, the Plan must be accepted by each Class of holders of Claims or Interests (subject to an exception discussed below and in Article III.C.4.). Under the Bankruptcy Code, a *Class* of holders of Claims or Interests has accepted the Plan if, of the Claims in the Class that actually are voted on the Plan, such Claims constituting at least two-thirds in dollar amount and more than one-half in number of Allowed Claims vote to accept the Plan, excluding the votes of Insiders. For example, if a hypothetical class has ten claims that are voted and the total dollar amount of those ten claims is $1,000,000, then for such class to have accepted the plan, six or more of those claims must be voted to accept the plan (a simple majority), and the claims voted to accept the plan must total at least $666,667 (a two-thirds majority).

### 4. Cramdown

If any impaired Class of Claims does not vote to accept the Plan, the Court may nevertheless confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. If the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" to each Class of dissenting holders of Claims or Interests, the Court may confirm the Plan through "cramdown." The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive.

With respect to each dissenting Class of unsecured Claims, "fair and equitable" means either:(i) the members of each dissenting impaired Class of Unsecured Claims receive property of a value, as of the Effective Date of the Plan, equal to the amount of its Allowed Claim; or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of Unsecured Claims will not receive any property under the Plan. The Plan is not fair and equitable to a Class of holders of Interests if any Class of holders of Claims is paid more than in full.

### 5. Absolute Priority Rule

Simply characterized, the absolute priority rule set forth in section 1129(b)(2)(B) of the Bankruptcy Code requires that confirmation obtained by "cramdown" meet an "either/or" test. Either (I) the members of each dissenting impaired Class of Unsecured Claims must be paid in full, or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of claims must not receive any property under the plan of reorganization on account of "such junior interest." The absolute priority rule applies only in cases where a Class of Claims or Equity Interests is impaired and does not accept the Plan. Thus, the absolute priority rule does not apply to all Classes of Claims and Equity Interests but only to the dissenting Class and Classes junior to the dissenting Class. The application of the absolute priority rule and the new value exception contain complexities and subtleties, the explanation of which is beyond the scope of this Disclosure Statement. To the extent a Claim holder or Interest holder desires further explanation regarding such rule or its exception, they are advised to seek advice of experienced bankruptcy counsel.

## IV.  BACKGROUND OF DEBTOR AND EVENTS LEADING TO BANKRUPTCY

### A.  History of the Debtor

In 2006 and 2007, Iglesia Puerta Del Cielo, Inc. entered into contractual agreement with Harmony Science Academy in which a portion of their building would be leased out to Harmony Science Academy for a period of 10 years. A management group was formed and entered into contract with Iglesia Puerta Del Cielo, Inc. to manage the relationship and needs of the school for the duration of the school's lease agreement(s).

Shortly thereafter, the charter school wanted another building for its high school. After negotiations and a new lease agreement with amendments, Iglesia Puerta Del Cielo, Inc. began construction of a new facility for Harmony Science Academy Charter School. Iglesia Puerta Del Cielo, Inc. was in contact with ECCU (the current lender and lien holder on the property) regarding the loan needed to complete the project. The Debtor contended ECCU's representative in Texas was not communicating this information with their main office in California. With the time frame that was involved in the project, Iglesia Puerta Del Cielo, Inc. invested almost $2,000,000 of its own monies, expecting they could get a loan for the project, based on the financially lucrative terms and rents the lease agreement provided. When ECCU's representative allegedly stopped communicating with Iglesia Puerta Del Cielo, Inc., Iglesia Puerta Del Cielo, Inc. began to look for other means of funding.

Iglesia Puerta Del Cielo, Inc. took out hard-money loans from the Isaac Group Lenders totaling $800,000 and another $400,000 from some combination of Prestige Alfa Investors (Adrian Rascon, Noe Rodriguez and Ernesto Herrera) to continue the construction on the building.

Several months passed and Iglesia Puerta Del Cielo, Inc. still could not find a lender to fulfill the remaining portion of the construction. ECCU called Iglesia Puerta Del Cielo, Inc. roughly six (6) months later. After long discussions, ECCU decided to fulfill the remaining portion of funding needed to complete the project. The agreement between Iglesia Puerta Del Cielo, Inc. and ECCU was that one (1) year after the completion of the building, ECCU would refinance Iglesia Puerta Del Cielo, Inc. with permanent terms and conditions.

Several months later, Iglesia Puerta Del Cielo, Inc. and the management group began having issues with the work that was involved in managing the relationship with the charter school and the new facility. Iglesia Puerta Del Cielo, Inc. sought out the help of the Law Offices of David Pierce to help develop a 'Rules and Responsibilities' document that would clearly lay out what would be expected of the management group. Two of the three members decided not to comply with these rules and responsibilities. Iglesia Puerta Del Cielo, Inc. again asked Attorney Ryan Little what they could do to solve this problem. The contract that Iglesia Puerta Del Cielo, Inc. had signed with the management group was very vague and crafty in its language, supposedly arguing that the management group could not be fired. Iglesia Puerta Del Cielo, Inc. decided to fire and sue the management group for failing to comply with the 'Rules and Responsibilities' document that was drafted with conditions that were beyond fair and legal for its purpose. Iglesia Puerta Del Cielo, Inc. then encountered another problem with a document that was signed by Iglesia Puerta Del Cielo, Inc. regarding liens by Prestige Alfa Investors on the 16 acres adjacent to the property. The signed document was fraudulent and has no consideration whatsoever. At this time, Iglesia Puerta Del Cielo, Inc. has litigation pending in bankruptcy court against Canales, Arizpe on the management contract and Adrian Rascon and others concerning the unfunded $750,000.00 promissory note that alleges a lien against the Debtor's property.

Within a month or two of Iglesia Puerta Del Cielo, Inc. entering into the above litigation, ECCU decided not to refinance Iglesia Puerta Del Cielo, Inc. Based on the existence of the forgoing suits. After a prior loan modification, the notes to ECCU matured in September 2009. Iglesia Puerta Del Cielo, Inc. had been looking for the better part of two (2) years for a company to refinance with, but the rule of thumb in refinancing is that no one will refinance while a company is in litigation. No lenders were found. Iglesia Puerta Del Cielo, Inc. filed for Chapter 11 Code on November 6, 2009.

The Debtor proceeded to negotiate with the various creditor classes during the Chapter 11. The result was a plan of reorganization being confirmed in June 29, 2010.

Post-Confirmation the Debtor commenced its payments to creditors. The payments continued for a little over three (3) years, but not without significant sacrifices. The economic downturn that commenced in 2009 continued to impact the Debtor's revenues, especially in the area

of tithes. Tithing contributions continued to decline during 2010-2013.

A significant drain on the Debtor's ability to sustain its 2010 level of operations was payments to creditors holding liens on the sixteen (16) acres of Unimproved Land. In the summer of 2013, it became clear that debt service needed to be reduced or multiple defaults under the 2010 Confirmed Plan of Reorganization were imminent.

The Debtor chose to file this Chapter 11 case rather than incur the costs of defending litigation related to plan of reorganization defaults.

Attached hereto as Exhibit B is a brochure with a short description of the church.

  B.  <u>Background of the Debtor' President</u>

See Exhibit C attached hereto.

  C.  <u>Management's Discussion of the Events Leading to Bankruptcy</u>

Prior to the Petition Date, the Debtor was unable to pay off the principal and interest on its long-term debt, and other required payments under the June 29, 2010 Confirmed Plan of Reorganization. No other sources of capital were available as the Unimproved Land had three (3) liens against it totaling $1.3 million. Unable to restructure its debt outside of bankruptcy, and with litigation pending against it, the Debtor was forced to make the decision to reorganize its debts under Chapter 11 of the Bankruptcy Code.

  D.  <u>Goal of the Debtor's Bankruptcy Case</u>

The Debtor's Bankruptcy Case is intended to assist the Debtor in: (a) restructuring the Debtor's long-term secured debt; and (b) addressing current cash flow deficiencies. The Debtor intends to convey the sixteen (16) acres of Unimproved Land to its lien holders in full satisfaction of the outstanding debts against it.

## V.  POST-PETITION OPERATIONS AND SIGNIFICANT ORDERS AND EVENTS

  A. <u>Post-Petition Operations</u>

Since the Debtor filed the voluntary petition, the Debtor has continued to operate in the normal course of business. The Debtor has filed its schedules and statements of financial affairs with the Court (including all amendments and supplements thereto, the "Schedules"). The Schedules contain a detail the Debtor's assets, liabilities, and other information related to the business activities. Copies of the Debtor's Schedules may be obtained online from the Court's website at: http://www.txwb.uscourts.gov/pacer. For information or to subscribe to PACER (the online court-document-viewing system), you may visit the PACER Service Center website at

http://pacer.psc.uscourts.gov/index.html or call 800-676-6856. Due to the payment of certain creditors and certain court-approved agreements, the Debtor's Schedules may be subsequently amended from time to time to reflect such payments; however, any failure not to amend shall not result in a claimant's Claim receiving a distribution for amounts already satisfied, released, or assigned.

Also, in conformance with the Guidelines of the Office of the United States Trustee for the Western District of Texas, the Debtor will filed the required monthly operating reports and pay the quarterly United States Trustee fees. The monthly operating reports detail the Debtor's postpetition operating activities, income, and disbursements. Copies of the Debtor's monthly operating reports may be obtained online from the Court's website at: http://wvw.txwb.uscourts.gov/pacer.

### B. Significant Orders and Events During the Debtor's Bankruptcy Case

#### 1. Employment of Professionals

On November 12, 2013, the Debtor filed its application to employ James & Haugland, P.C. as its bankruptcy counsel, and the Court entered an order for the Firm's employment on December __, 2013.

#### 2. Meeting of Creditors and Claims Bar Dates

On December __, 2013, the Debtor attended its initial interview with the United States Trustee. On December 11, 2013, the Debtor attended the United States Trustee meeting of creditors under section 341(a) of the Bankruptcy Code. The Claims Bar Date for filing Claims against the Debtor is March 11, 2014. The Debtor will thereafter analyze Claims and may file objections to one or more of such Claims. Claims not filed by the applicable Claims Bar Date are forever barred and discharged unless scheduled by the Debtor as liquidated, non-contingent and undisputed.

#### 3. Administration of Case/First Day Pleadings

In November 2013, the Court conducted hearings on the following matters, including "First Day" motions:

1.  Debtor's Emergency Motion Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for an Order (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Service on Account and (2) Specifying Adequate Assurance of Payment for Post-Petition Utility Services [ Docket No. 8].
2.  Debtor's Emergency Motion for Order (1) Authorizing Continued Use of Existing Business Forms and Record; and (2) Authorizing Maintenance of Existing Corporate Bank Accounts [Docket No. 7].
3.  Debtor's Disclosure of Compensation [Docket No. 6].
4.  Debtor's Application to Employ Attorney [Docket No. 5].
6.  Debtor's Application to Employ Accountant [Docket No. 10].

7.  Debtor's Emergency Motion Authorizing the Use of Cash Collateral [Docket No. 9].

## VI.  ASSETS AND LIABILITIES OF THE DEBTOR

### A.  Overview of the Debtor's Assets and Liabilities

The Debtor has expended considerable time and effort to ensure the accuracy of the estimated information set forth below; however, no representation can be made that such information is without some level of inaccuracy. Moreover, the information set forth below is subject to the uncertainties of litigation and other factors that may not be resolved in the Debtor' favor. Therefore, no assurance can be given that the estimated Allowed Claims are exact or that the estimated recoveries will be achieved.

The Debtor's assets consist of two (2) parcels of real estate located on Betel Drive in the Lower Valley portion of El Paso, EL Paso County, Texas. The smaller twelve (12) acre tract is developed and contains the facilities for the worship hall, offices, etc. and the Harmony Science Academy charter school with about 800 students. This parcel also contains a parking area for the church and school. The larger sixteen (16) acre parcel is undeveloped raw land.

Non-real estate assets of the Debtor include tithes from congregation members, furniture and fixtures associated with the operation of the church and monthly lease income from Harmony Science Academy charter school. The Harmony Science Academy payment is presently $99,000.00 per month. Historically, the annual tithing sums have averaged during 2010-2013 _____.

The sixteen (16) acre unimproved real estate has an appraisal of $1,900,000.00 in 2008, and is currently listed for sale. The August 2013 appraisal is $1,775,000.00. No offers to purchase have been received to date.

The Debtor's monthly operating reports may be obtained at the Courts' website at: http://www.txnb.uscourts.gov/pacer/.

The Debtor's liabilities are detailed in Article VI.C. below.

### B.  Claims Asserted Against the Debtor

Please see the chart below for the Debtor's chart of claim classification. The Claims filed against the Debtor have not necessarily become Allowed Claims. The Debtor is in the process of analyzing these Claims and may file objections to one or more of such Claims. The Plan allows the Reorganized Debtor three (3) months after the Effective Date to file objections to Claims. The Plan further provides that the filing, litigation, settlement, or withdrawal of all objections and Estate Actions may be made by the Reorganized Debtor. The Debtor's claims register are available on the Courts' website at: http://www.txnb.uscourts.gov/pacer/. The Debtor's claims register contains some claims that have been paid, resolved in lower amounts, are duplicative, or are disputed by the Debtor.

### C. Estimated Allowed Claims and Estimated Recoveries

Notwithstanding the type and amount of Claims filed against the Debtor, the Debtor estimates that the aggregate Allowed Claims against the Debtor's estates will be as follows:

| Class of Claims | Classification of Claims | Estimated Number of Claims | Estimated Allowed Amt. of Claims | Estimated Recovery of Class |
|---|---|---|---|---|
| N/A | Administrative Claims | 1 | $20,000 (beyond paid retainers) | Unimpaired |
| N/A | Priority Tax Claims | 0 | $0.00 | (Unimpaired; paid over 5- year period) |
| Class 1 | Allowed Secured Tax Claims | 0 | ---- | Unimpaired |
| Class 2 | Secured Claims of Evangelical Christian Credit Union (ECCU) | 1 | $8,405,739 | Impaired (see Section 2) |
| Class 3 | Allowed Claims of Isaac Group Lenders | 1 | $763,589 | Unimpaired |
| Class 4 | Secured Allowed Claims of Judgment Creditors | 1 | $104,588 | Unimpaired |
| Class 5 | Secured Allowed Claim of Rodriguez-Herrera | 2 | $154,788 | Unimpaired |
| Class 6 | General Unsecured Claims | 2 | $192,750 | Impaired (see Section 6) |
| Class 7 | Subordinated and Penalty Claims | unknown | $0 | (no recovery) |
| Class 8 | Interests | 3 | None | (no recovery) |
| -- | Totals | 18 | 9,641,454 | -- |

D.  Monies Raised Through Bankruptcy Cases

On the Petition Date, the Debtor held a positive cash balance of over $27,000.00 in its operating account.  The Debtor also had liabilities in excess of $9 million on this date.

In addition to the above, the Bankruptcy case allowed the Debtor to continue to generate additional funds with which to pay ordinary operating expenses, vendors, bankruptcy professionals and lenders.  Without the Bankruptcy case, the Debtor would have been unable to make any distributions to creditors because the funds in the Debtor's accounts would have been seized by the Debtor's lender Evangelical Christian Credit Union, and the Debtor would have been unable to fund even its current monthly business expenses.

E.  Estimated Professional Fees and Reorganization Costs

The Debtor estimates that aggregate requested post-petition professional fees and other reorganization costs asserted in its Bankruptcy Case, excluding ordinary course liabilities, will be less than $100,000 (exclusive of retainers already held in counsel's trust account) on the Effective Date, assuming an Effective Date in April 2014.  The estimated requested administrative expenses will be as follows:

| Administrative Claims (all subject to Court Approval) | Total | Amt. Accrued and Still Due |
|---|---|---|
| James & Haugland, P.C., Bankruptcy counsel for the Debtor | $20,000 | ($23,409 retainer paid) |
| Leticia Molina tax professional for the Debtor | $13,000 | |
| Quarterly United States Trustee fees | $5,000 | $0 |
| Printing and mailing costs associated with Solicitation and Confirmation | $2,000 | $0 |
| Miscellaneous Administrative Claims (including Section 506(b) attorneys fees) | $5,000 | $5,000 |
| **Totals** | **$45,000** | |

F.  Preference and Other Avoidance Litigation and Estate Actions

The Debtor does not believe there will be significant recoveries through prosecution of Estate Actions.  However, this section describes certain causes of action that the Debtor may have, may bring and/or may waive enforcement actions.

Pursuant to the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the

Page 17 of 59

filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre- existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code. In the case of Insiders, the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the debtor's and the transferee's businesses, according to ordinary business terms, are not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery. The Debtor reserve all rights to pursue, in its sole discretion, any Estate Actions not limited to but including any preference to the full extent allowed under the Bankruptcy Code and applicable state laws unless released by the Plan. The Debtor may also pursue other actions including but not limited to actions under sections 542 and 549 of the Bankruptcy Code.

After review of the Debtor payments within the 90-day and 1-year prepetition periods, the Debtor does not believe there are amounts recoverable for the benefit of the estates as preferences and/or fraudulent transfers.

Also, under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered it insolvent if, and to the extent, the Debtor receive less than fair value for such property. The Debtor reserve all rights to pursue, in its sole discretion, any fraud or fraudulent transfer to the full extent allowed under the Bankruptcy Code and applicable state laws unless released by the Plan.

Additionally, prior to and since the filing of the Bankruptcy Cases, acts of third parties may have given rise to Estate Actions including but not limited to claims for equitable subordination, certain breach of contract and tortuous interference with contract actions, claims for negligence and gross negligence, and claims for lost profits, damages, and attorneys fees. The Debtor reserves all rights to pursue, in its sole discretion, any such claims to the full extent allowed under the Bankruptcy Code and applicable state laws.

## VII.   OVERVIEW OF THE PLAN

The Plan envisions the Debtor will emerge from Chapter 11 with all priority and unsecured and secured Claims being fully paid on the Effective Date. Except for Evangelical Christian Credit Union ("ECCU"), all secured creditors shall be paid in full through transfers of collateral to the respective lenders and the Class 6 Unsecured Creditors shall also receive a three (3) acre piece of land behind the concrete ditch as full payment for their claims.

The Harmony Science Academy El Paso charter school lease will be assumed by the Reorganized Debtor. The Lease pays the Reorganized Debtor ninety-nine thousand dollars ($99,597) per month and has a remaining term of approximately with forty-three (43) months. The Reorganized Debtor intents to utilize the net proceeds (after operating expenses) from the Lease to

make payments to creditors under the Plan. The debtor expects the lease to be renewed because the charter school presently has 800 students and plans not only to increase enrollment but also add a college curriculum.

During the five (5) years from the Effective Date, assuming no additional Secured borrowing, the only secured debt will be the Evangelical Christian Credit Union lien on the church and school. The expectation is that the Lease will be renewed or renegotiated at the end of its present term on substantially similar terms. Harmony Science Academy ("HSA") El Paso is supported by state and federal funding grants and has been rated "exemplary" by the Texas Education Agency. HSA is one of the six (6) exemplary charter schools among the 190 charter schools in Texas and one of the fifteen (15) exemplary high schools among the 1,274 Texas public high schools. Harmony Science Academy (also, Harmony Science Academies) is a college-preparatory charter school system in Texas and Louisiana. The Harmony school was founded, organized and operated by the non-profit Cosmos Foundation. HSA has experienced a period of rapid expansion during the last eight (8) years, since the opening of its first school in Houston, for the 2000-2001 school year, followed by the opening of HSA Austin in the next year and HSA Dallas two years later. Currently, the HSA school system has twenty-six (26) schools, including locations in El Paso, Bryan, Austin, Dallas, Houston, Beaumont, Lubbock, Waco, San Antonio and Fort Worth. HSA schools provide highly accelerated programs of learning, with students often having the required amount of high school credits for reception of a high school diploma by the 11th grade although they stay until the 12th grade to complete college level course.

HSA schools have a stronger focus on the education of mathematics and science than on other subjects. However, a wide variety of subjects are taught at the schools due to the flexibility of the charter school system, which allows HSA schools to adapt curricula based on the needs and desire of their students. Nearly each HSA school opens only with acceptance of students into a middle school, from the 6th grade to the 8th grade, and a grade is added each year. Many times, an elementary school is added to a Harmony school once it has established itself. HSA Houston and HSA Austin both have all grade levels including kindergarten, as they are the oldest charter schools in the school system. As of September 2008, the Texas Education Agency had recognized all HSA schools as either "Exemplary" or "Recognized". IN 2009, US News & World Report awarded the HSA schools the 'Bronze' medal for school quality.

With a college acceptance rate at one hundred percent (100%), Harmony Public Schools have earned the reputation of providing a distinct, high-quality education. They also have the honor of being T-STEM field pioneer schools. The mission at Harmony Public Schools is to prepare each student for higher learning in a collaborative atmosphere through a quality learner-centered educational program with a strong emphasis on math, science, engineering and technology. HSA's size and preference: 25 schools, 12,050 students, 100% college acceptance rate and 0% drop-out rate. Cosmos Foundation in the group that launched Harmony Public Schools. The Texas-based not-for-profit organization was established by a group of dedicated educators and university academicians who were passionate about the way children approached math and science. The Cosmos Foundation is a non-profit corporation that was established in Houston, Texas. The foundation is organized and shall operate exclusively for educational, scientific and literary purposes. The Cosmos Foundation

is the parent organization for Harmony Science Academies (collectively called Harmony Schools). The Cosmos Foundation is currently operating twenty-five (25) charter schools in Texas.

Should the Charter School wish to renew the Lease but occupy a smaller space, the Debtor believes that sufficient revenue will be generated from the new Lease to pay the Evangelical Christian Credit Union monthly debt service under the Plan of Reorganization. For further information concerning HSA, go to www.hsaelpaso.org.

The August 2013 appraisal of the 11.682 acre parcel fronting Betel Drive was determined to have a fair market value of $1,475,000.00. Recorded liens against this property on the Petition Date are as follows:

| | | |
|-----|----------|-------------|
| (a) | Class 3 - | $763,589.00 |
| (b) | Class 4 - | $104,588.00 |
| (c) | Class 5 - | $155,788.00 |
| | | $1,023,955.00 |

Classes 3-5 are "over-secured creditors".

The over-secured creditor is entitled to adequate protection only of *its interest*. There is no unconstitutional taking of a security interest that is in excess of the claim secured by it, if after the taking the creditor remains adequately protected. *Matter of James Wilson Assoc.*, 965 F.2d 160, 171 (7th Cir. 1992). According to the Fifth Circuit, "common sense tells us that property is the indubitable equivalent of itself." *Sandy Ridge Development Corp. v. Louisiana National Bank*, 881 F.2d 1346, 1350 (5th Cir. 1989).

The case of *Matter of Sandy Ridge* also held that § 1129(b)(2)(A)(iii) does not require that a creditor receive the indubitable equivalent of its entire claim, but only of its secured claim. The level of proof required to show the creditor will receive the indubitable equivalent of its claim is by a preponderance of the evidence. *In re Briscoe Enterprises, Ltd. II*, 994 F.2d 1160 (5th Cir. 1993). The methodology generally follows a "fair market value" analysis (the same as the valuation mandated by the Texas Deficiency Statute § 51.003 Texas Property Code).

Where, as here, collateral is to be returned to the Secured Creditor having equity it is generally required that the estate retain the benefit of the over payment (or value of the "equity") and this may be done out of that collateral itself. This is a bifurcation of the claim between fully secured (the indubitable equivalence of the interest in the collateral), and the "over-secured" portion. The "fully secured" portion must be valued and must account for the "indubitable equivalent" of the secured creditor's interest in the collateral in order for the estate to retain any interest. The secured creditor has no right to protect an "equity cushion" post confirmation. *Bank of New York Trust, N.A. v. Official Unsecured Creditor's Committee (In re Pacific Lumber Co.)* 584 F.3d 229, 248 (5th Cir. 2009).

When the Debtor demonstrates sufficient value being returned to the secured creditor to satisfy the secured creditor's interest in the collateral, in full, then one of two events must occur: (a) the secured creditor is paid in full with no deficiency claim and with no over-payment (i.e. the fair market value of the collateral equals the secured debt); OR (b) the secured creditor is "paid in full" whit it receives a partial surrender of collateral thereby retains no deficiency claim but the estate must retain the equity portion of the collateral (equivalent to the "equity" or over-payment on the secured claim). *In re May*, 174 BR 832, 836-40 (S.D. Ga. 1994); *In re Atlanta Southern Business Park, Ltd.*, 173 BR 444, 449 (Bankr.N.D. Ga. 1994).

Under circumstance (b), the Debtor no longer owes any of the debt, but has the right to the equity – that is, to use the "retained" collateral (here it is used to satisfy the second lien (Class 4) and the third lien (Class 5)) for its reorganization, free from the secured creditor's lien, or receive in some other fashion the value of that equity for use in the reorganization plan. *In re Park Forest Development Corp.*, 197 BR 942 (Bankr. N.D. Ga. 1996); *In re Simons* 113 B.R. 942 (Bankr. W.D. Tex. 1989).

The valuation methodology for returned collateral is the fair market value at confirmation. *In re Peesman*, 109 BR 718 (Bankr. W.D. Tex. 1989). In the case of real estate (here), the fair market value test re requires that the real estate be valued at its "highest and best use". *Id.* The "fair market value" remains the value whether in the hands of the Debtor(Iglesia) of the hands of the Lender(s) (Classes 3-5). *In re El Paso Truck Center, Inc.* 129 B.R. 109 (Bankr. W.D. Texas 1991). To be sure the mandated "fair market value" for surrendered collateral contains elements that will constitute credits against the valuation depending on the nature and extent of the real estate (i.e. developed vs. undeveloped, etc.). In fact, the standards of deductions and additions to arrive at a "fair market value". *Id.*

The universally recognized "standard definition" of "fair market value" is "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant fact." *Floyd v. Hefner* 566 F.Supp 2d 617 (S.D.Tex. 2008).

There are three general groups of methodologies for determining value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach.

The sales comparison approach in a *real estate appraisal* is based primarily on the principle of substitution. This approach assumes a prudent individual will pay no more for a property than it would cost to purchase a comparable substitute property." The approach recognizes that a typical buyer will compare asking prices and seek to purchase the property that meets his or her wants and needs for the lowest cost. Since comparable sales are not usually identical to the subject property, adjustments may be made for date of sale, location, style, amenities, square footage, site size, etc. The main idea is to simulate the price that would have been paid if each comparable sale were identical to the subject property *at the time of the comparable sale*.

In every real estate Chapter 11 case, every secured creditor subject to a payout runs the risk of future markets and future operations. What looks like a feasible plan based upon reasonable

assumptions of value today could change such that the secured creditor's debt is not paid and the collateral it ultimately has (being all the collateral it may ever had had) has diminished in value. Thus, nothing in the Code provisions of § 1129(b) mandate a guarantee - just as the finding of future feasibility is not required to be proven under a standard of a guarantee of success by the debtor.

*In re May,* 174 B.R. 832 (Bankr. S.D. Ga. 1994), involved a plan proposing to convey a portion of a creditor's collateral that provided the creditor, after a judicial determination of value, with only a 1.5 percent margin or error. *Id.* at 836. Stated differently, the value set by the court exceeded the creditor's claim by only 1.5 percent. The court confirmed the plan and noted that

> *'risk is present in any case in which a court is required .,. to make a determination of value'* and that it could not "be the guarantor of the values it sets during the course of a bankruptcy case." *Id.* at 839-40 [Emphasis added.]

In *In re Atlanta Southern Bus. Park Ltd.* the court was faced with the issue of whether valuation should be determined as of the confirmation date or at a later date when the secured creditor was ultimately able to sell the collateral. *Id.* at 449. The court rejected the secured creditor's argument that the sale date controls, pointing out that "when valuation is for the purpose of plan confirmation, the value must be determined as of the date the plan is confirmed ... [and] [n]othing in the Code requires the Court to treat a valuation in an indubitable equivalent situation any differently." Id. at 450.

### A. Introduction

THE PLAN ANNEXED HERETO AS EXHIBIT "A" IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT. THE OVERVIEW OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. THE ANNEX(EXHIBIT "A-1") TO THE PLAN CONTAINING A GLOSSARY OF DEFINED TERMS IS APPLICABLE FOR BOTH DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION. IN THE EVENT OF AN INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE OVERVIEW CONTAINED HEREIN, THE TERMS OF THE PLAN SHALL GOVERN.

Generally, the Plan is a Chapter 11 plan of reorganization that vests the assets of the Debtor's estates in the Reorganized Debtor. The Reorganized Debtor will be directed to make distributions and payments required by the Plan, object to Claims against the Debtor's estates, and prosecute claims and Estate Actions against third parties as appropriate.

On the Effective Date, all real and personal property of the Debtor's estates, including but not limited to all Estate Actions, shall vest in the Reorganized Debtor; provided that upon any subsequent conversion to a case under Chapter 7, all assets vesting in the Reorganized Debtor shall pass to the Chapter 7 trustee as property of the Chapter 7 estate subject to those Claims, liens, and encumbrances as allowed and restructured in the Plan and as specified therein. From and after the Effective Date, the Reorganized Debtor shall be authorized to operate in the ordinary course of business, and shall be authorized to make the distributions required under, and implement the

provisions of the Plan.

### B. Classification of Claims and Interests

#### 1. Classification

Pursuant to section 1122 of the Bankruptcy Code, except as otherwise provided herein, all Claims (except for Administrative Claims and Priority Tax Claims) and all Interests shall be classified as set forth in this Article III of the Plan. The classification of Claims and Interests in Article III of the Plan gives effect to the priority scheme generally adopted by the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims are not classified under the Plan, and the treatment of those Claims is set forth in Article II of the Plan.

#### 1a. Unclassified Administrative Claims

Treatment for and payment to all persons or entities holding an Administrative Claim against the Debtor is set forth in Section 2.1 of the Plan of Reorganization.

#### 1b. Unclassified Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such holder's Allowed Priority Tax Claims at the sole discretion of the Reorganized Debtor, (1) the amount of such holder's Allowed Claim at the applicable statutory rate payable in equal quarterly installments, commencing on April 1, 2014 and ending with a balloon payment on April 1, 2015, (2) a lesser amount in one Cash payment as may be agreed upon in writing or (3) such other treatments as may be agreed upon in writing.

#### 2. Identification of Classes

The Plan classifies the Claims against the Debtor and Interest in the Debtor as follows:

| | |
|---|---|
| Class 1: | Allowed Secured Tax Claims |
| Class 2: | Allowed Secured Claims of Evangelical Christian Credit Union |
| Class 3: | Allowed and Secured Claims of Isaac Group Lender |
| Class 4: | Allowed and Secured Claims of Judgment Creditors |
| Class 5: | Allowed and Secured Claim of Rodriguez-Herrera |
| Class 6: | General Unsecured Claims |

Class 7:        Subordinated and Penalty Claims

Class 8:        Interests.

### 3. Unimpaired Classes

Class 1 is unimpaired under the Plan and are presumed to have accepted the Plan.

### 4. Impaired Classes

Classes 2, 3, 4, 5 and 6 are impaired under the Plan and are entitled to vote on the Plan. Classes 7 and 8 are not receiving any property under the Plan, are deemed to have rejected the Plan, and may not vote to accept or reject the Plan.

### C. Treatment of Allowed Claims and Interests

The Plan provides for distributions only on Allowed Claims.

### 1. Class 1 Secured Tax Claims

Each holder of a Class 1 Allowed Secured Tax Claim payable to a taxing authority shall be paid in full, with statutory interest on such Allowed Secured Tax Claim, on the Distribution Date. El Paso County shall retain all liens securing pre- and post-petition taxes until such taxes are paid in full. Post-petition taxes incurred in the ordinary course of business shall be paid in the ordinary course of business prior to delinquency without the need for filing administrative expense claims. El Paso County Class 1 claim shall be entitled to interest pursuant to section 506(b) of the Bankruptcy Code at the Texas State statutory rate of one percent (1%) per month accruing from the Petition Date through the Effective Date of the Plan, and shall be entitled to interest at the rate of twelve percent (12%) per year, paid monthly as set forth herein, accruing from the date following the Effective Date until paid in full. The Debtor shall be authorized, and have agreed, to pay de minimis Claims of El Paso County under $100.00 by the Effective Date so as to prevent additional interest from accruing on such de minimis amounts. Class 1 is unimpaired under the Plan and is deemed to accept the Plan.

### 2. Class 2 - Secured Claims of Evangelical Christian Credit Union ("ECCU")

The holder of the Allowed Secured Claim in Class 2 shall receive promissory notes from the Reorganized Debtor in the amount owing on its Secured Claims including post-petition interest and attorneys fees as allowed under Section 506(b). According to the Debtor's records the total amount owed as of September 30, 2013 approximated eight million seven hundred nineteen thousand eleven dollars and thirty-three cents ($8,405,739.55) excluding attorneys fees.

The promissory notes executed in conjunction with the Loan Modification Agreement between the Debtor and ECCU dated June 29, 2010 shall continue to be repaid in monthly installments commencing on the Distribution Date and thereafter on the same day of each

consecutive month until paid. The note shall accrue interest at the pre-default rate of six and one half percent (6.5%) per annum. The monthly payments shall continue on the Effective Date based on a thirty (30) year amortization (estimated at approximately $55,000.00 per month) and shall continue in said amounts until July 2016, when the monthly payments shall increase to $80,000.00 per month The note shall mature and be do and payable in full on July 15, 2020. The amortization schedule for the promissory note shall initially be for thirty (30) years commencing on the Distribution Date of the Plan, with an increase to $80,000.00 per month in July 2016, and a balloon payment on July 15, 2020.

The Class 2 Creditor shall retain all liens on the Reorganized Debtor's collateral, including replacement liens granted by Orders of the Court, until the indebtedness is paid in full. The Reorganized Debtor shall be entitled to prepay the indebtedness at any time without incurring a prepayment penalty.

All payments received by the Class 2 Creditor during the pendency of the case pursuant to a cash collateral or other order of the Bankruptcy Court shall be applied to ECCU's Secured Claims (including post-petition interest) in accordance with ECCU's loan documents.

New loan and collateral documents if requested by ECCU shall be in form and substance similar to those currently governing ECCU's loans. All prior promissory notes, agreements, documents of indebtedness and obligations executed by the Debtor pre-petition in conjunction with the Claim associated with Class 2 including but not limited to all default and foreclosure rights, remain in full force and effect until expressly modified by the Plan and replaced by new loan documents. Section 12.14 of the Plan does not apply to the Class 2 creditor.

You may refer to Article VI.G. of the Disclosure Statement for background on Evangelical Christian Credit Union claims against the Debtor.

The Class 2 Allowed Secured Claim is impaired and entitled to vote on the Plan of Reorganization.

### 3. Class 3 - Secured Allowed Claims of Isaac Group Lender

Under the terms of the Plan of reorganization confirmed June 29, 2010, the Debtor was to repay the Class 3 Creditor $800,000.00 in principal plus interest at prime plus 3.25 percentage points payable in the amount of at least $8,750.00 per month. The promissory note is secured by a first lien on deed of trust ("First Mortgage") on the sixteen (16) acre Unimproved Land owned by the Debtor.

As of the Petition Date, the Debtor owed the Class 3 Creditor $763,589.00.

The Debtor has obtained an appraisal of the Unimproved Land. The appraisal was performed in August 2013 and values the sixteen (16) acre parcel at one million nine hundred thousand dollars ($1,900,000.00). An additional appraisal conducted at the same time reflected the following valuations:

| | | | |
|---|---|---|---|
| a) | 11.682 acres with frontage on Betel at : | $2.90/SF | $1,475,000.00 |
| b) | 3.669 acres (without road frontage) at: | $2.00/SF | $320,000.00 |
| c) | 3.669 acres (with road frontage on Burgundy) at: | $2.75/SF | $440,000.00 |

The 11.682 acre parcel is zoned for single family dwellings and is situated in a developed neighborhood. The Debtor believes this property can be developed (or sold) by the Class 3 Creditor and achieve full cash realization for the amount of the Class 3 Claim.

In order to provide access to a 3.699 acre parcel being deeded to the Class 6 Creditors, a twenty four foot (24') wide strip will be excluded from the conveyance/abandonment to the Class 3-5 Creditors. At present, this area is shown as "Bordeaux Drive" on the survey attached to the Martha Gayle-Reid appraisal completed in August 2013.

On the Effective Date of the Plan, the Debtor shall abandon all ownership rights to the 11.682 acres (on Betel) of the Unimproved Land in full and complete satisfaction of any and all indebtedness owing on that Effective Date to the Class 3 Creditors. This parcel of land has street frontage and is zoned for residential housing. A "mature" neighborhood surrounds this 11.682 acres of the Unimproved Land.

This transfer is known as a "dirt for debt" satisfaction of any and all indebtedness owing to the Class 3 Creditor through the Effective Date of the Plan.

The Debtor believes the return of the 11.682 acre parcel fronting Betel Drive satisfies the "fair and equitable" requirement of Section 1129(b)(2)(A) as it provides the Class 3 Creditor with the "indubitable equivalence" of its Claim.

The Debtor is required to provide in the Plan that each secured creditor be provided value of its secured claims. *Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir. 1989). According to the value placed on the 11.682 acre parcel in August 2013 ($1,475,000.00) by the real estate appraiser (Martha Gale-Reid of GAYLE-REID Appraisal Services, Inc.), the Debtor has satisfied its obligation to provide the Class 3 Creditor with the "indubitable equivalence" of its Secured Claim.

The Debtor, its bankruptcy estate, and the Reorganized Debtor shall release the Isaac Group Lender from any and all claims and causes of action (including any Estate Actions). The Isaac Group Lender shall release the Debtor, its bankruptcy estate and the Reorganized Debtor from any and all claims and causes of action, except for those based on obligations and liabilities provided for under the Plan.

Subject to confirmation of the Plan by the Court, the treatment provided under the Plan to Class 3 supercedes all prior promissory notes, agreements, documents of indebtedness and obligations executed by the Debtor pre-petition in conjunction with the Claim associated with Class

3.

The Class 3 Creditors are Unimpaired and therefore NOT entitled to vote on the Plan of Reorganization.

### 4. Class 4 – Secured Claim of Allowed Claims of Judgment Creditors

Under the terms of the Plan of Reorganization confirmed on June 29, 2010, the Debtor was to repay the Class 4 Creditors $200,000.00 in principal interest at 6.5% and payable in the initial amount of at least $3,000.00 per month. The promissory note is secured by a second lien deed of trust ("Second Mortgage") on the sixteen (16) acre Unimproved Land owned by the Debtor.

As of the Petition Date, the Debtor owed the Class 4 Creditors $104,588.00.

The Debtor has obtained an appraisal of the Unimproved Land. The appraisal was performed in August 2013 and values the sixteen (16) acre parcel at one million nine hundred thousand dollars ($1,900,000.00). An additional appraisal conducted at the same time reflected the following valuations:

| | | | |
|---|---|---|---|
| a) | 11.682 acres with frontage on Betel at : | $2.90/SF | $1,475,000.00 |
| b) | 3.669 acres (without road frontage) at: | $2.00/SF | $320,000.00 |
| c) | 3.669 acres (with road frontage on Burgundy) at: | $2.75/SF | $440,000.00 |

The 11.682 acre parcel is zoned for single family dwellings and is situated in a developed neighborhood. The Debtor believes this property can be developed (or sold) by the Class 4 Creditor and achieve full cash realization for the amount of the Class 4 Claim.

In order to provide access to a 3.699 acre parcel being deeded to the Class 6 Creditors, a twenty four foot (24') wide strip will be excluded from the conveyance/abandonment to the Class 3-5 Creditors. At present, this area is shown as "Bordeaux Drive" on the survey attached to the Martha Gayle-Reid appraisal completed in August 2013.

On the Effective Date of the Plan, the Debtor shall abandon all ownership rights to the Unimproved Land in full and complete satisfaction of any and all indebtedness owing on that Effective Date to the Class 4 Creditors.

This transfer is known as a "dirt for debt" satisfaction of any and all indebtedness owing to the Class 4 Creditors through the Effective Date of the Plan.

The Debtor believes the return of the 11.682 acre parcel fronting Betel Drive satisfies the "fair and equitable" requirement of Section 1129(b)(2)(A) as it provides the Class 4 Creditor with the "indubitable equivalence" of its Claim.

Page 27 of 59

The Debtor is required to provide in the Plan that each secured creditor be provided value of its secured claims. *Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir. 1989). According to the value placed on the 11.682 acre parcel in August 2013 ($1,475,000.00) by the real estate appraiser (Martha Gale-Reid of GAYLE-REID Appraisal Services, Inc.), the Debtor has satisfied its obligation to provide the Class 4 Creditor with the "indubitable equivalence" of its Secured Claim.

The Debtor, its bankruptcy estate, and the Reorganized Debtor shall release the Judgment Creditors from any and all claims and causes of action (including any Estate Actions). The Judgment Creditors shall release the Debtor, its bankruptcy estate and the Reorganized Debtor from any and all claims and causes of action, except for those based on obligations and liabilities provided for under the Plan.

The Class 4 Allowed and Secured Claim is Unimpaired and therefore NOT entitled to vote on the Plan of Reorganization.

### 5. Class 5 Allowed and Secured Claim of Rodriguez-Herrera

Under the terms of the Plan of Reorganization confirmed on June 29, 2010, the Debtor was to repay the Class 5 Creditors (jointly and severally) $225,000.00 in principal, plus interest at 6.5% payable in the amount of at least $3,000.00 per month. The promissory note was secured by a third lien deed of trust ("Third Mortgage") on the sixteen (16) acre Unimproved Land owed by the Debtor.

As of the Petition Date, the Debtor owed the sum of $154,788.00 to the Class 5 Creditors.

The Debtor has obtained an appraisal of the Unimproved Land. The appraisal was performed in August 2013 and values the sixteen (16) acre parcel at one million nine hundred thousand dollars ($1,900,000.00). An additional appraisal conducted at the same time reflected the following valuations:

| | | | |
|---|---|---|---|
| a) | 11.682 acres with frontage on Betel at : | $2.90/SF | $1,475,000.00 |
| b) | 3.669 acres (without road frontage) at: | $2.00/SF | $320,000.00 |
| c) | 3.669 acres (with road frontage on Burgundy) at: | $2.75/SF | $440,000.00 |

The 11.682 acre parcel is zoned for single family dwellings and is situated in a developed neighborhood. The Debtor believes this property can be developed (or sold) by the Class 5 Creditor and achieve full cash realization for the amount of the Class 5 Claim.

In order to provide access to a 3.699 acre parcel being deeded to the Class 6 Creditors, a twenty four foot (24') wide strip will be excluded from the conveyance/abandonment to the Class 3-5 Creditors. At present, this area is shown as "Bordeaux Drive" on the survey attached to the Martha Gayle-Reid appraisal completed in August 2013.

Page 28 of 59

On the Effective Date of the Plan, the Debtor shall abandon all ownership rights to the Unimproved Land in full and complete satisfaction of any and all indebtedness owing on that Effective Date to the Class 5 Creditors.

This transfer is known as a "dirt for debt" satisfaction of any and all indebtedness owing to the Class 4 Creditors through the Effective Date of the Plan.

The Debtor believes the return of the 11.682 acre parcel fronting Betel Drive satisfies the "fair and equitable" requirement of Section 1129(b)(2)(A) as it provides the Class 5 Creditor with the "indubitable equivalence" of its Claim.

The Debtor is required to provide in the Plan that each secured creditor be provided value of its secured claims. *Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir. 1989). According to the value placed on the 11.682 acre parcel in August 2013 ($1,475,000.00) by the real estate appraiser (Martha Gale-Reid of GAYLE-REID Appraisal Services, Inc.), the Debtor has satisfied its obligation to provide the Class 5 Creditor with the "indubitable equivalence" of its Secured Claim.

The Debtor, its bankruptcy estate, and the Reorganized Debtor shall release the Judgment Creditors from any and all claims and causes of action (including any Estate Actions). The Judgment Creditors shall release the Debtor, its bankruptcy estate and the Reorganized Debtor from any and all claims and causes of action, except for those based on obligations and liabilities provided for under the Plan.

The Class 5 Allowed Secured Claim is Not Impaired therefore NOT entitled to vote on the Plan of Reorganization.

### 6. Class 6 General Unsecured Claims

Holders of Allowed General Unsecured Claims against the Debtor will have their Allowed Claims treated and discharged in accordance with the terms of the Plan. Such distribution shall be in full satisfaction of such holder's Claims.

The Debtor estimates that it owes $192,750.00 to its unsecured creditors in Class 6.

Holders of Class 6 claims will have their Allowed Claims against the Debtor treated and discharged in accordance with the terms of the Plan. Such distribution shall be in full satisfaction of such holder's Claims.

For the Class 6 Claim Treatment, the Debtor will transfer a 3.699 acre parcel (behind the concrete ditch) to the Class 6 Creditors in full satisfaction of the Class 6 Indebtedness. This parcel is currently land locked, but has been appraised in August 2013 at $320,000.00. With the completion of Bordeaux Drive, the property will no longer be land locked. The appraised value of this parcel when not "land-locked" is $440,000.00.

In the event, albeit highly unlikely, that one (or more) of the Class 3-5 Creditors are not fully secured, the Debtor will make monthly cash payments, on a pro-rata basis, over sixty (60) months to any Secured Creditor determined to have a Deficiency Claim after a court hearing pursuant to Section 506 of the Bankruptcy Code.

Attached hereto, as Exhibit D, is a five (5) year cash flow analysis. This analysis is based upon ECCU being the only secured creditor. Until the Bankruptcy Court conducts the Section 506 hearing(s), it is not ascertainable whether the "free" cash flow on Exhibit A will be sufficient to satisfy the Deficiency Claims in full.

No interest, penalties or attorneys fees will be paid on Class 6 Claims.

The basis for this opinion rests on the fact that the first lien debt on both the 12 acre (church/school) and 16 acre (unimproved) parcels are sufficiently large enough to attract a few, if any qualified cash bidders at a foreclosure sale. It is presumed that ECCU would bid in its current estimated debt amount of $8,000,000.00 and the Isaac Group Lenders would do the same for their debt on the Unimproved Land. At those amounts, the Debtor does not think that a "cash buyer" would show up at foreclosure and pay an amount that would satisfy these liens.

Accordingly, any foreclosure by ECCU would capture all the Debtor's assets except the sixteen (16) acre Unimproved Land (presently encumbered by more than $1,400,000.00 in filed.

The Debtor projects that it could pay the Class 6 Creditors in full, on a pro-rata monthly payment basis, over a five (5) year period. The Debtor believes the real estate transfer option will yield a quicker pay-off because (a) the Debtor has been approached in recent years by persons interested in building apartments on the smaller 3.669 acre parcel, (b) the smaller parcel is already zoned for apartments, (c) the governmental authority for the irrigation ditch has verbally stated that if a "tube" was placed in the ditch, that the area could also be used for the apartment complex, and (d) one of the two Class 6 Creditors is a builder/developer and presumably has "contacts" that would enable the Class 6 Creditors to effectuate a quick sale and gain full payment.

The Class 6 Creditors are Impaired and entitled to vote on the Plan of Reorganization.

### 7. Class 7 Subordinated and Penalty Claims

No property shall be distributed to, or retained by, holders of Allowed Subordinated or Penalty Claims. Pursuant to 11 U.S.C. § 510 or any other applicable law or agreement, the Debtor may equitably subordinate Claims of creditors who are not entitled or should not be allowed to share in the assets of the Debtor's estate for any equitable, contractual, statutory, factual, or legal reason whatsoever. Class 7 Creditors are impaired but are not entitled to vote on the Plan of Reorganization for the reason that each Class 7 Creditor is deemed to have Rejected the Plan of Reorganization.

### 8. Class 8 Interests

No property of the estate shall be distributed to, holders of Allowed Interests in the Debtor. Class 8 is not impaired and is not entitled to vote. The Class 8 Interest Holders shall Retain their stock certificates in the Reorganized Debtor.

### 9. Establishment of Contested-Claim Reserve

Notwithstanding any other provision of this Plan, no assets or property shall be distributed under this Plan on account of any Contested Claim. For all Contested Claims, the Reorganized Debtor shall establish and hold, in trust, reserves (the "Contested-Claim Reserve") with respect to each Claim for which there exists a Contested Claim, and shall place in the Contested-Claim Reserve the assets and property to be distributed on account of such Contested Claims pursuant to this Plan, pending Allowance or Disallowance of such Claims. If by the Class 5 Unsecured Distribution Date there is pending a Final Order concerning a Contested Claim, the Reorganized Debtor shall pay into the Contested- Claim Reserve all payments provided for under this Plan pursuant to any Allowed Claim that would have been required to be delivered to the claimant absent an objection to the claimant's Claim. Cash held in the Contested- Claim Reserve shall be held in a segregated trust account. To the extent practicable, the Reorganized Debtor may invest the Cash in the Contested-Claim Reserve in a manner that will yield a reasonable net return, taking into account the safety of the investment.

The Bankruptcy Court may, at any time, determine the amount of assets sufficient to fund the Contested- Claim Reserve. The Bankruptcy Court may estimate and determine by an Estimation Order the Estimated Amount of Claims for which the Contested-Claim Reserve has been established. Any claimant holding a Contested Claim so estimated will have recourse only to undistributed assets and property in the Contested-Claim Reserve and not to the Debtor, the Reorganized Debtor, or any other assets or property, should the Allowed Claim of such claimant, as finally determined by a Final Order, exceed such Estimated Amount.

### D. Treatment of Allowed Administrative Claims

#### 1. Treatment of Administrative Claims

##### (a) Time for Filing Administrative Claims.

To the extent it has not already done so, each holder of an Administrative Claim, other than (1) a Fee Claim, or (2) a liability, including without limitation sales taxes, incurred and paid in the ordinary course of business by the Debtor after the Petition Date, must file with the Bankruptcy Court and serve on the Debtor and counsel, and all other parties entitled to receive notice, notice of such Administrative Expense Claim within thirty (30) days after the Effective Date. Such notice must include at a minimum: (1) the name of the holder of the Claim; (2) the amount of the Claim; and (3) the basis of the Claim. Failure to file and serve this notice timely and properly shall result in the Administrative Claim being forever barred and discharged.

(b)     Time for Filing Fee Claims.

To the extent it has not already done so, each Professional Person or other entity that holds or asserts an Administrative Expense that is a Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court, and serve on the Debtor and counsel, and all parties entitled to receive notice, a Fee Application within sixty (60) days after the Effective Date.  To the extent necessary, entry of the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding procedures for the payment of Fee Claims.

( c)     Allowance of Administrative Claims.

An Administrative Claim with respect to which notice has been properly filed pursuant to Article 2.1(a) of the Plan shall become an Allowed Administrative Claim only to the extent allowed by Final Order.  An Administrative Claim that is a Fee Claim, and with respect to which a Fee Application has been properly filed pursuant to Article 2.1(b) of the Plan, shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

(d)     Payment of Allowed Administrative Claims.

Each holder of an Allowed Administrative Claim against the Debtor shall receive (1) the amount of such holder's Allowed Claim in one Cash payment on or before the expiration of ten (10) days after entry of the Order Allowing fees or (2) such other treatment as may be agreed upon in writing by the Debtor and such holder; provided, however, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtor may be paid in the ordinary course of business by the Debtor.

2. *Payment of Statutory Fees.*

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid through the entry of a final decree in the respective Bankruptcy Case.

E.  Objections to Claims and Interests

1. *Objection Deadline.*

As soon as practicable, but in no event later than three (3) months after the Effective Date, unless extended by order of the Bankruptcy Court, all objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. The Reorganized Debtor need not object to any tardily filed claims, and such claims shall be deemed disallowed upon entry of the Confirmation Order. Notwithstanding the foregoing sentence, the Reorganized Debtor retains the right to object to late-filed and all other Claims, including claims filed pursuant to §§ 502(g), (h), and (I) of the Bankruptcy Code. The Debtor and the Reorganized Debtor reserve all rights whatsoever to object to or subordinate any claims whatsoever on any grounds and to raise any and all defenses, counterclaims, cross claims, set offs, and/or recoupments, in law or in equity or pursuant to § 502(d) of the Bankruptcy Code.

*2. Prosecution of Objections and Estate Actions.*

On and after the Effective Date, the filing, litigation, settlement or withdrawal of all objections to Claims or Estate Actions shall be made by the Reorganized Debtor unless a particular cause of action is released or assigned to a third party pursuant to terms of the Plan of Reorganization.

F. Provisions Governing Executory Contracts and Unexpired Leases Under the Plan

*1. Assumption of Certain Contracts; Rejected if Not Assumed.*

The Plan constitutes and incorporates a motion to assume and assign to the Reorganized Debtor Iglesia Puerta Del Cielo Inc., as of the Effective Date, the Lease and Contracts listed on Schedule G, attached as Exhibit E, (also listed below), the Executory Contract Schedule. No cure of such Contracts pursuant to Bankruptcy Code section 365(b)(1)(A) is necessary other than the Cure Payments, if any, listed therein, and no Bankruptcy Code section 365(b)(I)(B) compensation is owing or shall be owing upon the assumption of such Contracts. Confirmation of this Plan shall be deemed (I) adequate assurance of prompt cure of any default under such Contracts solely based upon the Reorganized Debtor's obligations in the Plan to make the Cure Payments and (ii) adequate assurance of future performance under such Contracts. Other than the Contracts listed on Schedule G hereof, the Plan constitutes and incorporates a motion to reject, as of the Effective Date (the "Rejection Deadline"), all Contracts to which the Debtor are a party unless there is pending with the Bankruptcy Court as of the Rejection Deadline (a) a motion filed by the Reorganized Debtor to assume any such Contract, or (b) a motion filed by the Reorganized Debtor to extend the Rejection Deadline. Entry of the Confirmation Order by the Bankruptcy Court constitutes approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

The Debtors and Reorganized Debtor hereby assume all existing leases and executory contracts, including but not limited to the Harmony Science Academy Charter School, office equipment, housing, furniture, automobiles and insurance interests.

Charter School - Lease to be Assumed by Iglesia Puerta Del Cielo, Inc.

A non-residential real property lease by the Debtor with the Harmony Science Academy Charter School at 9405 Betel in El Paso, Texas at the monthly rental fee of ninety-nine thousand five hundred ninety-seven hundred dollars ($99,597.00) will be assumed by the Reorganized Debtor.

*2. Bar to Rejection Damages*

If the rejection of a Contract by the Debtor pursuant to this Plan results in damages to the other party or parties to such Contract, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, the Reorganized Debtor, or its respective property or its agents, successors or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor on or before thirty (30) days following the Rejection Deadline.

### 3. *Insurance Policies.*

Notwithstanding any other provision of the Plan, including but not limited to Articles 9.1 and 9.2, all insurance policies under which the Debtor is the insured party with respect to any property shall be deemed assumed as of the Effective Date.

### 4. *Timing of Cure Payments.*

All Cure Payments shall be made (a) by the Reorganized Debtor in equal monthly installments beginning on the Distribution Date, or (b) at the Reorganized Debtor's option, in full on the Distribution Date.

### G. Miscellaneous Provisions of the Plan

### 1. *Setoff and Other Rights.*

In the event that the Debtor has claims of any nature whatsoever against the holder of a Claim, the Debtor may, but is not required to, setoff against the Claim (and any payments or other distributions to be made in respect of such Claim hereunder), subject to the provisions of section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor of any claim or other legal recourse that the Debtor has against the holder of a Claim. It is the Debtor's position that a holder of a Claim who owes the Debtor a contract balance should not be entitled to setoff the amount owed to the Debtor if such contract balance is necessary for the Debtor's successful reorganization.

### 2. *Discharge.*

The rights afforded in the Plan shall discharge all existing debts and claims of any kind, nature, or description whatsoever against the Debtor or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code; upon the Effective Date, all existing Claims against the Debtor shall be, and shall be deemed to be, discharged, and all holders of Claims shall be precluded from asserting against the Debtor, or any of its assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim. Confirmation of the Plan and the obligations imposed on the Debtor and/or the Reorganized Debtor herein shall be in complete satisfaction, discharge and release of all Claims of any nature whatsoever against the Debtor and/or the Reorganized Debtor or any of its assets or properties; and, upon the Effective Date, the Debtor shall be deemed discharged, and released from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(I) of the Bankruptcy Code that arise prior to the Confirmation Date, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code, or (c) the holder of a Claim based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor except as set forth in the Plan of Reorganization.

As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained, to the extent it relates to a Claim, discharged and operates as an injunction against the prosecution of any action against the Debtor, or its property, to the extent it relates to a Claim discharged. The discharge granted herein shall not discharge the Reorganized Debtor from the obligations in the Plan.

Further, under the Plan and Confirmation Order, the following Notes, Deeds of Trust, and Assignments shall be determined to be invalid, and shall be discharged, extinguished and cancelled: (a) the $400,000 Promissory Note executed by the Debtor made payable to Prestige Alfa Investors LLP dated July 25, 2007, the $750,000 Promissory Note executed by the Debtor made payable to Noe Rodriguez, Adrian Rascon, and Ernesto Herrera dated July 25, 2007, the $200,000 Promissory Note executed by the Debtor made payable to Prestige Alfa Investors LLP, Noe Rodriguez and Ernesto Herrera dated May 31, 2007, the $25,000 Promissory Note executed by the Debtor made payable to Adrian Rascon dated April 3, 2007 (collectively "Notes"); and (b) all Deeds of Trust securing such Notes and any Assignments of such Notes and Deeds of Trust, including the following: (1) Deed of Trust dated 05/31/07, filed 06/05/07, under file No. 20070052118, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. to TAFFY BAGLEY, as Trustee for PRESTIGE ALFA INVESTORS, LLP, NOE RODRIGUEZ and ERNESTO HERRERA (by payment to ADRIAN RASCON), securing that certain indebtedness in the original principal amount of $200,000.00 and other indebtedness, if any, secured thereby, to all of which and its record, reference is here made for full particulars; (2) Deed of Trust, Security Agreement and Financing Statement dated 7/25/07, filed 10/2/07, under file No. 20070093896, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. d/b/a GATES OF HEAVEN CHURCH to TAFFY BAGLEY, as Trustee for PRESTIGE ALFA INVESTORS, LLP, securing that certain indebtedness in the original principal amount of $400,000.00 and other indebtedness, if any, secured thereby; and Transfer and Assignment of Note and Lien from PRESTIGE ALFA INVESTORS LLP to RENE RASCON and ALFONSO RASCON dated 2/22/08, filed 2/26/08, under file No. 20080014684, Real Property Records, El Paso County, Texas, to all of which and its record, reference is made for full particulars; and (3) Deed of Trust, Security Agreement and Financing Statement dated 7/25/07, filed 8/01/07, under file No. 20070074107, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. a/k/a GATES OF HEAVEN CHURCH to TAFFY BAGLEY, as Trustee for NOE RODRIGUEZ, ADRIAN RASCON and ERNESTO HERRERA, securing that certain indebtedness in the original principal amount of $750,000.00 and other indebtedness, if any, secured thereby; and Transfer and Assignment of Note and Lien from ADRIAN RASCON to MARIA DE JESUS ORTIZ and RODOLFO GAMEZ, dated 2/22/08, filed 2/26/08, under file No. 20080014685, Real Property Records, El Paso County, Texas; and Agreement of Payees between ADRIAN RASCON, NOE RODRIGUEZ, and ERNESTO HERRERA dated 3/03/08, filed 3/14/08, under file No. 20080020330, Real Property Records, El Paso County, Texas, to all of which and its record, reference is here made for full particulars.

In addition, under the Plan and Confirmation Order, the Associated Joint Venture Contract between the Debtor and Prestige Alfa Investors, LLP and Adrian Rascon dated May 31, 2007 shall be determined to be invalid and without consideration

### 3. Injunctions.

The Confirmation Order shall contain such injunctions as may be necessary or helpful to effectuate the discharge of the Debtor provided herein. Without limiting the generality of the foregoing, such injunction shall include an absolute prohibition from pursuing or collecting Claims in any manner other than as provided for in the Plan, including any execution order of sale, constructive trusts, statutory trusts, civil or criminal fines, penalties, or restitution payments, or liabilities arising from contribution, subrogation, warranty, indemnification or guarantee agreements. The injunction shall also prohibit any Utility from seeking or obtaining a security deposit, altering usual billing practices or otherwise refusing or discontinuing services for a period of eighteen (18) months after the Effective Date; provided, however, that a Utility will no longer be subject to such injunction in the event that the Reorganized Debtor fails to pay any undisputed post-confirmation utility bills for such Utility within the time such bills are due.

### 4. Payment of Judgment from Bankruptcy Court.

The Debtor and Reorganized Debtor shall not be required to satisfy any judgment entered by an Adversary Proceeding except as set on the forth in the Plan of Reorganization treatment of the class of claims to which the adversary claimant is a member, or as specified otherwise herein.

### 5. Exculpation and Release.

The Debtor, shall not have or incur any liability to any holder of a Claim or Interest for any act, event, or omission in connection with, or arising out of, the Bankruptcy Case, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence. The Order Confirming the Plan of Reorganization shall act as a complete of the Debtor for all events, counts or debts prior to that date entered on the Court's docket.

### 6. Lawsuits.

Upon entry of the Confirmation Order, all lawsuits, litigation, administrative, police, or regulatory actions, or other proceedings, judicial or administrative, in connection with the assertion of a Claim against the Debtor or the Representatives, shall be subject to the discharge injunctions set forth in the Bankruptcy Code and the Court's Confirmation Order. Such discharge injunctions shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan. All parties to any such action shall be enjoined by the Bankruptcy Court in the Confirmation Order from taking any action in violation of the Bankruptcy Code or the Confirmation Order. All lawsuits, litigations, administrative, police, or regulatory actions, or any other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtor shall become property of the Reorganized Debtor to prosecute settle, or dismiss as the Reorganized Debtor sees fit.

### 7. Insurance.

Confirmation and consummation of the Plan shall have no effect on assumed insurance

·policies of the Debtor in which the Debtor is or was the insured party; the Reorganized Debtor shall become the insured party or parties under any such policies. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Debtor' bankruptcy, the Plan, or any provision within the Plan.

### 8. *Post-Effective Date Fees and Expenses of Professional Persons.*

The Reorganized Debtor shall, in the ordinary course of business and without the necessity for any notice, motion, fee application, or approval by the Bankruptcy Court, pay the reasonable fees and expenses arising post- Effective Date of the Professional Persons employed by the Reorganized Debtor. Any disputes regarding such fees and expenses shall be submitted to the Bankruptcy Court.

### 9. *Bankruptcy Restrictions.*

From and after the Effective Date, the Reorganized Debtor shall no longer be subject to the restrictions and controls provided by the Bankruptcy Code (e.g., section 363, 364) or Bankruptcy Rules (except with respect to claim objections and avoidance or recovery of Estate Actions under bankruptcy law), the Bankruptcy Court, or the United States Trustee's guidelines (however, the Reorganized Debtor shall provide the United States Trustee such quarterly financial reports as are required until the entry of a final decree). The Reorganized Debtor may compromise claims and controversies arising post-Effective Date without the need of notice to Creditors or Bankruptcy Court approval. Post-Effective Date, the Reorganized Debtor may operate its business in such manner as is consistent with companies not in bankruptcy without the need of seeking Bankruptcy Court approval with regard to any aspect of the Reorganized Debtor's business, except that the Reorganized Debtor shall comply with all terms of this Plan.

### 10. *Binding Effect.*

The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims, the holders of Interests, and all of its respective successors and assigns; provided, however, that if the Plan is not confirmed, the Plan shall be deemed null and void and nothing contained herein shall be deemed (a) to constitute a waiver or release of any Claims by the Debtor or any other person, (b) to prejudice in any manner the rights of the Debtor or any other person or holders if any Claim or (c) to constitute any admission by the Debtor or any other person.

### 11. *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the law of the jurisdiction of organization of any entity, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan or the Bankruptcy Case, including the Plan Documents and any documents executed pursuant to the Plan.

### 12. Modification or Revocation of Plan.

Modifications of the Plan may be proposed in writing by the Debtor at any time before the Confirmation Date, provided that (a) the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; (b) the Debtor shall have complied with section 1125 of the Bankruptcy Code; and (c) such modification otherwise complies with the Bankruptcy Code. The Plan may be modified at any time after the Confirmation Date and before substantial consummation by the Debtor, provided that (I) the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, (ii) the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under section 1129 of the Bankruptcy Code, and (iii) the Debtor serves creditors with any proposed modification and notice of hearing for same, and (iv) the circumstances warrant such modifications. A holder of a Claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

The Debtor reserves the right to revoke and/or withdraw the Plan prior to entry of the Confirmation Order. If the Debtor revokes and/or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be deemed null and void and nothing contained herein shall be deemed (a) to constitute a waiver or release of any Claims by the Debtor or any other person, (b) to prejudice in any manner the rights of the Debtor or any other person, or (c) to constitute an admission by the Debtor or any other person.

### 13. Creditor Defaults.

Any act or omission by a creditor in contravention of a provision within this Plan shall be deemed an event of default under this Plan. Upon an event of default that remains uncured after notice and opportunity to cure, sufficient under the circumstances, the Reorganized Debtor may seek to hold the defaulting party in contempt of the Confirmation Order. If such creditor is found to be in default under the Plan, such party may be required to pay the reasonable attorneys' fees and costs of the Reorganized Debtor in pursuing such matter. Furthermore, upon the finding of such a default by a creditor, the Bankruptcy Court may (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Rule 70 of the Federal Rules of Civil Procedure, or (b) issue and enter such other order as may be equitable which does not materially alter the terms of the Plan as confirmed.

### 14. Debtor Default.

In the event that the holder of an Allowed Claim asserts that a default under the Plan has occurred, such person must provide the Reorganized Debtor and its counsel with written notice of such default and a reasonable opportunity to cure. If the default asserted in the notice remains uncured on the thirtieth (30th) day from the date on which such notice is sent, the holder of such Allowed Claim may pursue any rights or remedies it may have under the Plan, applicable non-bankruptcy law, whether state, federal, or otherwise, including in the Bankruptcy Court.

            *15. Disallowance and Subordination of Subordinated Claims and Penalty Claims.*

The Debtor reserves all rights to seek subordinated classification of Subordinated Claims and Penalty Claims pursuant to section 510 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law or agreement, whether in law or in equity.

*16. Prohibition on Nonvoting Equity Securities.*

Pursuant to section 1123 of the Bankruptcy Code, the Debtor's corporate charters shall be amended so as to include a provision prohibiting the issuance of nonvoting equity securities and contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee.

*17. Integration Clause.*

This Plan is a complete, whole, and integrated statement of the binding agreement between the Debtor, creditors, and the parties-in-interest upon the matters herein.

*18. Retention of Causes of Action.*

The Reorganized Debtor shall retain, all rights, claims, defenses, and causes of action including, but not limited to, the Estate Actions, and shall have sole authority to prosecute such actions except for those released in the Plan. The Reorganized Debtor shall constitute the representative of the estates for purposes of prosecuting Estate Actions and pursuant to Section § 1123 (b)(2)(B) of the Bankruptcy Code. All adversary proceedings, claims objections or other actions involving a creditor on the Effective Date shall be deemed to have been disclosed to all parties in interest as if set forth in the Plan of Reorganization with specificity.

*19. Severability.*

Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Debtor may modify the Plan in accordance with Article 12.15 of the Plan so that such provision shall not be applicable to the holder of any Claim or Interest. Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

*20. Notice to the Reorganized Debtor.*

Notice required by the Plan must be sent as follows:

| If to the Reorganized Debtor: | With copy to: |
|---|---|
| Marco A. Aguirre<br>President<br>Iglesia Puerta Del Cielo, Inc.<br>9405 Betel Drive<br>El Paso, Texas 79907-3457<br>Telephone: (915) 859-5790<br>Email: marco@pdcchurch.com | Wiley F. James, III<br>Texas State Bar No. 10554300<br>James & Haugland, P.C.<br>609 Montana Ave.<br>El Paso, Texas 79902<br>Telephone: (915) 532-3911<br>Facsimile : (915) 541-6440<br>E-mail : wjames@jghpc.com |

### 21. Substantial Consummation/Closing the Case.

Upon completion of the actions to be taken pursuant to Article II of the Plan, the Plan shall be deemed substantially consummated and, upon motion by the Reorganized Debtor, a final decree entered containing such provisions as may be equitable. The Court may close the case, but retain jurisdiction to hear and decide: (a) any and all pending adversary proceedings, applications, and contested matters, including any remands of appeals; (b) any and all pending objections to Claims or the allowance, including with respect to the classification, priority, estimation, or payment of any Claim; and (c) any and all pending Fee Applications.

### 22. Retiree Benefits.

As required by section 1129(a)(13) of the Bankruptcy Code, all retiree benefits shall be continued after the Effective Date for the period the Debtor have obligated themselves to provide such benefits.

### VIII. MEANS FOR EXECUTION OF THE PLAN

A. Powers and Duties of the Reorganized Debtor with Respect to Consummation of the Plan.

Under the Plan, the Reorganized Debtor is empowered to: (a) take all steps and execute all instruments and documents necessary to effectuate the Plan; (b) make distributions and payments contemplated by the Plan; (c) comply with the Plan and the obligations thereunder; (d) employ, retain, or replace Professional Persons to represent them with respect to its responsibilities; (e) object to Claims; (f) prosecute the Estate Actions; and (g) exercise such other powers as may be vested in the Reorganized Debtor pursuant to order of the Court or pursuant to the Plan or as the Reorganized Debtor deems to be necessary and proper to carry out the provisions of the Plan. The Reorganized Debtor shall have the duties of carrying out the provisions of the Plan, which shall include taking or not taking any action that the Reorganized Debtor deems to be in furtherance of the Plan.

B. Return of Unimproved Land

Under the Plan, the Debtor will "abandon" or "return" the sixteen (16) acre parcel adjacent to the church. In prior years, the Debtor had plans to develop the property. Reduced cash flow, decreased tithes, and required creditor payments under the Plan of Reorganization confirmed June 29, 2010 made this goal unattainable.

Currently, the following creditors hold liens against the Unimproved Land:

| Class 3 | Isaac Williams Group | $763,589.00 | First Lien |
| Class 4 | Judgment Creditors | $104,588.00 | Second Lien |
| Class 5 | Rodriguez-Herrera | $154,788.00 | Third Lien |

The Debtor obtained an appraisal of the Unimproved Land in September 2013. According to the appraisal, the value of the sixteen (16) acre parcel is $1,775,000.00.

The abandonment/return of the sixteen (16) acre parcel will be in full satisfaction of all past and present Claims held by the Class 3-5 Creditors against the Debtor.

C. Officers and Managers.

The current officers and managers of the Debtor shall continue as officers and managers of the Reorganized Debtor and shall be subject to subsequent shareholders' meetings in the Reorganized Debtor's ordinary corporate governance after the Effective Date.

The Debtor's President receives a housing allowance and automobile lease payments. Neither subsidy, nor salaries, have affected the Debtor during the Chapter 11 or will adversely effect post-confirmation cash flow in a manner that would affect payments to Creditors.

Directors of the Reorganized Debtor would be compensated at the rate of $10,000/year for attendance at meetings and other official functions or duties. Directors of the Debtor, as with any corporate governance board, oversee the operations of the corporation and the management decisions of its officers.

D. Vesting of Assets.

On the Effective Date, all real and personal property (except the sixteen (16) acre Unimproved Land parcel) of the estate of the Debtor, including but not limited to all Estate Actions, shall vest in the Reorganized Debtor; provided that upon any subsequent conversion to a case under Chapter 7, all assets vesting in the Reorganized Debtor, shall pass to the Chapter 7 trustee as property of the Chapter 7 estate subject to those Claims, Liens, and encumbrances as Allowed and restructured in this Plan and as specified herein.

Further, on the Effective Date, the Unimproved Land shall vest in those entities holding a lien against same free and clear of all claims, liens, interests and encumbrances, including but not limited to all deeds of trust, mortgages, leases, and assignments of record, including the following: (1) Deed

Page 41 of 59

of Trust dated 05/31/07, filed 06/05/07, under file No. 20070052118, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. to TAFFY BAGLEY, as Trustee for PRESTIGE ALFA INVESTORS, LLP, NOE RODRIGUEZ and ERNESTO HERRERA (by payment to ADRIAN RASCON), securing that certain indebtedness in the original principal amount of $200,000.00 and other indebtedness, if any, secured thereby, to all of which and its record, reference is here made for full particulars; (2) Deed of Trust, Security Agreement and Financing Statement dated 7/25/07, filed 10/2/07, under file No. 20070093896, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. d/b/a GATES OF HEAVEN CHURCH to TAFFY BAGLEY, as Trustee for PRESTIGE ALFA INVESTORS, LLP, securing that certain indebtedness in the original principal amount of $400,000.00 and other indebtedness, if any, secured thereby; and Transfer and Assignment of Note and Lien from PRESTIGE ALFA INVESTORS, LLP to RENE RASCON and ALFONSO RASCON dated 2/22/08, filed 2/26/08, under file No. 20080014684, Real Property Records, El Paso County, Texas, to all of which and its record, reference is made for full particulars; (3) Deed of Trust, Security Agreement and Financing Statement dated 7/25/07, filed 8/01/07, under file No. 20070074107, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. a/k/a GATES OF HEAVEN CHURCH to TAFFY BAGLEY, as Trustee for NOE RODRIGUEZ, ADRIAN RASCON and ERNESTO HERRERA, securing that certain indebtedness in the original principal amount of $750,000.00 and other indebtedness, if any, secured thereby; and Transfer and Assignment of Note and Lien from ADRIAN RASCON to MARIA DE JESUS ORTIZ and RODOLFO GAMEZ, dated 2/22/08, filed 2/26/08, under file No. 20080014685, Real Property Records, El Paso County, Texas; and Agreement of Payees between ADRIAN RASCON, NOE RODRIGUEZ, and ERNESTO HERRERA dated 3/03/08, filed 3/14/08, under file No. 20080020330, Real Property Records, El Paso County, Texas, to all of which and its record, reference is here made for full particulars; (4) Deed of Trust dated 03/28/07, filed 04/10/07, under file No. 20070033711, Real Property Records, El Paso County, Texas, from IGLESIA PUERTA DEL CIELO, INC. to RPLAP, INC., as Trustee for BANK OF AMERICA, N.A., securing that certain indebtedness in the original principal amount of $300,000.00 and other indebtedness, if any, secured thereby, to all of which and its record, reference is here made for full particulars; (5) Affidavit of Lien dated 3/3/08, of record in Volume 3/26/08, Page 20080023863, Real Property Records, El Paso County, Texas, wherein LUIS A. RODRIGUEZ vs. HARMONY SCIENCE ACADEMY, for a claim in the amount of $5,208 to the extent it pertains to the Unimproved Land; and (6) Lease Agreement between IGLESIA PUERTA DEL CIELO, INC., a Texas non-profit corporation, as Lessor and HARMONY SCIENCE ACADEMY, which is an operating name of Cosmos Foundation, Inc., as Lessee, dated 2-15-06, as referenced in that certain Memorandum of Lease dated 5-15-08, filed 5-23-08 under file No. 20080042040, Real Property Records, El Paso County, Texas to the extent it pertains to the Unimproved Land (collectively Liens/Encumbrances"). The Reorganized Debtor shall be authorized and directed to file a release and cancellation of the Liens/Encumbrances in the deed records of El Paso County, Texas based on the Plan and Confirmation Order. The Unimproved Land vested in the Reorganized Debtor shall be subject to and encumbered only by the First Mortgage granted to the Isaac Group Lenders under the Plan, the Second Mortgage granted to the Judgment Creditors under the Plan, and the Third Mortgage granted to Rodriguez-Herrera under the Plan.

E. Corporate Purpose of the Reorganized Debtor.

From and after the Effective Date, the Reorganized Debtor shall be authorized to operate in the ordinary course of business, and shall be authorized to make the distributions required under, and implement the provisions of, the Plan. The "Reorganized Debtor" shall be Iglesia Puerta Del Cielo, Inc.

F. Assumption of Liabilities.

The liability for and obligations under the Plan shall be assumed by and become obligations of the Reorganized Debtor.

G. Contested Claims.

On and after the Effective Date, the filing, litigation, settlement, or withdrawal of any and all objections to Claims or Estate Actions may be made solely by the Reorganized Debtor.

*1. Establishment of Contested-Claim Reserve.*

The Contested-Claim Reserve shall be established as set forth in Section 9 of the Plan.

*2. Determination of Contested-Claim Reserve.*

The Bankruptcy Court may, at any time, determine the amount of assets sufficient to fund the Contested- Claim Reserve if requested to do so by the Debtor. Otherwise the Contested-Claim Reserve is governed solely by Article IV of the Plan.

*3. Return of Assets.*

Except as otherwise provided herein, all assets and properties (and all interest payments and distributions previously paid in connection therewith) in the Contested-Claim Reserve remaining after the resolution of all disputes relating thereto shall be returned to the Reorganized Debtor.

*4. Withholding of Taxes.*

The Reorganized Debtor shall withhold from any assets and property distributed under this Plan any assets and property which must be withheld for federal, state, and local taxes payable by the Person entitled to such property to the extent required by applicable law.

H. Estimated Claims.

Except as otherwise provided herein, the Court may estimate for purposes of allowance pursuant to section 502 ( c) of the Bankruptcy Code, (I) any Contested Claim or unliquidated Claim, or (ii) any portion or part of a Claim that is, itself, unliquidated. Any Estimation Order, to the extent it becomes a Final Order, shall determine the amount of the Allowed Claim so estimated.

I. Powers and Duties of the Reorganized Debtor with Respect to Consummation of the Plan.

Under the Plan, the Reorganized Debtor is empowered to: (a) take all steps and execute all instruments and documents necessary to effectuate the Plan; (b) make distributions and payments contemplated by the Plan; ( c) comply with the Plan and the obligations thereunder; (d) employ, retain, or replace Professional Persons to represent them with respect to its responsibilities; (e) object to Claims; (f) prosecute the Estate Actions; and (g) exercise such other powers as may be vested in the Reorganized Debtor pursuant to order of the Court or pursuant to the Plan or as the Reorganized Debtor deems to be necessary and proper to carry out the provisions of the Plan. The Reorganized Debtor shall have the duties of carrying out the provisions of the Plan, which shall include taking or not taking any action that the Reorganized Debtor deems to be in furtherance of the Plan.

J. Provisions Governing Distributions.

The Reorganized Debtor is charged with the duty of making all distributions required under the Plan.

### 1. Date of Distributions.

Any distributions and deliveries to be made under the Plan shall be as provided for in this Plan. Notwithstanding any other provision of Plan, the Reorganized Debtor's cash accounts shall not be drawn below an aggregate positive balance of $20,000 (the "Minimum Cash Reserve"). Any distributions to be made under the Plan shall not be made if they would result in an aggregate positive balance below the Minimum Cash Reserve, and shall be held by the Reorganized Debtor until such time as they may be made without reducing the Debtor' aggregate cash accounts below the Minimum Cash Reserve.

### 2. Means of Cash Payment.

Cash payments made pursuant to the Plan shall be in U.S. funds, by check drawn on a domestic bank, or, at the Reorganized Debtor's option, by wire transfer from a domestic bank.

### 3. Delivery of Distributions.

Subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the proofs of Claim or proofs of Interest filed by such holders (or at the last known addresses of such a holder if no proof of Claim or proof of Interest is filed or if the Debtor has been notified in writing of a change of address), except as provided below. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts constituting undeliverable distributions shall be maintained for one year after such distributions are returned. All claims for undeliverable distributions shall be made on or before one (1) year after the distribution was made. After such date, all unclaimed property shall revert to the

Reorganized Debtor or any successor thereto, and the claim of any holder with respect to such property shall be discharged and forever barred.

### 4. Time Bar to Cash Payments.

Checks issued by the Reorganized Debtor of Allowed Claims shall be null and void if not negotiated within six (6) months after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before two hundred and ten (210) days after the date the check is issued. After such date, all Claims in respect of void checks shall be discharged and forever barred and shall revert to the Reorganized Debtor.

### 5. No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

### 6. Distributions After Allowance.

Payments and distributions to each holder of a Contested Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs. With respect to any Claim that is a Contested Claim on the Effective Date, within sixty (60) days after the date that the order or judgment of the Bankruptcy Court allowing such Contested Claim becomes a Final Order or a Contested Claim otherwise becomes an Allowed Claim, the Reorganized Debtor shall distribute to the holders of such Claim any Cash payment, without interest, that would have been distributed to such holder if the Claim had been Allowed on the Effective Date.

### 7. Distributions After Disallowance.

If any Withheld Distribution Amount remains in the Contested-Claim Reserve after all objections to Contested Claims of all Classes have been resolved, any remainder of the Contested-Claim Reserve attributable to the Disallowed Claims shall be returned to the Reorganized Debtor, with interest, if any, in accordance with the provisions of the Plan. The Reorganized Debtor shall not be required to distribute any remainder of the Contested- Claim Reserve to Allowed Claims, and such undistributed remainder shall revest in the Reorganized Debtor.

### 8. Exculpation Regarding Distributions.

Upon the Final Distribution Date the Reorganized Debtor shall be discharged, and released by all persons, holders of Claims or Interests, entities, and parties-in-interest receiving distributions under the Plan from any and all claims, causes of action, and other assertions of liability arising out of the Reorganized Debtor's discharge of the powers and duties conferred upon it by the Plan or any

order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan or applicable law. No current holder of a Claim or an Interest, and no representative thereof, shall have or pursue any claim or cause of action (a) against the Reorganized Debtor or its Representatives for making payments or taking any action in accordance with the Plan or for implementing the provisions of the Plan, or (b) against any holder of a Claim for receiving or retaining payments or other distributions as provided for by the Plan. The Reorganized Debtor is hereby indemnified and held harmless for any claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon them by the Plan or any orders of the Bankruptcy Court entered pursuant to or in furtherance of the Plan or applicable law, except only for actions or omissions arising out of the Reorganized Debtor's or Representatives' gross negligence or willful misconduct.

### 9. De Minimis Distributions.

Except as otherwise provided herein or in a Court Order, no distribution of less than $10.00 shall be required to be made to any holder of an Allowed Claim. Such undistributed amount may be retained by the Reorganized Debtor for distribution to other holders of Allowed Claims.

### K. Conditions Precedent to Effective Date.

#### 1. Conditions Precedent to Effective Date of the Plan.

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent: the Confirmation Order must contain approval of the proposed Class treatment and the injunctions contained in the Plan, and the Confirmation Order shall have become final and non-appealable, all documents effectuating the Plan must have been executed and delivered by the parties thereto, and all conditions to the effectiveness of such documents must have been satisfied or waived as provided therein. The Reorganized Debtor will file a Notice of Effective Date with the Bankruptcy Court. Unless the Court orders otherwise for cause shown, the Effective Date shall occur no later than ten (10) days after the Confirmation Order becomes final and nonappealable. The Debtor anticipates a April 2010 Effective Date.

#### 2. Waiver of Conditions.

The conditions to the Effective Date may be waived, in whole or in part by the Debtor, at any time, without notice. The failure to satisfy or waive any condition may be asserted by the Debtor regardless of the circumstances giving rise to the failure (including any actions or inaction by the Debtor). The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

### L. Retention of Bankruptcy Court Jurisdiction.

#### 1. Scope of Jurisdiction.

Pursuant to sections 157 and 1334 of title 28 of the United States Code, the Bankruptcy Court

shall have and retain jurisdiction over all matters arising in, arising under, and related to the Bankruptcy Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) To hear and determine pending applications for the assumption or rejection of contracts or leases the allowance of Claims resulting therefrom;

(b) To hear and determine any and all adversary proceedings, applications, and contested matters, including any remands of appeals, and including any Estate Actions;

(c) To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d) To hear and determine any timely objections to or applications concerning Claims or the allowance, classification, priority, estimation, or payment of any Claim or Interest, and to enter Estimation Orders;

(e) To hear and determine all Fee Applications and Fee Claims;

(f) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(g) To hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(h) To enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder;

(I) To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j) To enter and implement orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer and enforce injunctions provided for in the Plan and the Confirmation Order;

(k)    To recover all assets of the Debtor and property of the estates, wherever located;

(l)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)    To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(n)    To enter a final decree closing the Bankruptcy Case.

*2. Failure of the Bankruptcy Court to Exercise Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Bankruptcy Case, Article 11 of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## IX. FEASIBILITY AND RISKS

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor in interest, unless liquidation is expressly contemplated by the Plan. The Debtor' business plan underlies the projections set forth below.

**THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. SEE "CERTAIN RISK FACTORS," ARTICLE VII. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.**

A.    Management's Discussion of Financial Projections

This Section and related exhibits summarize the arithmetic projections and results, presented in the form of financial projections, of the business plan described in Article XIII above pursuant to which the business of the Debtor will be carried on by the Reorganized Debtor after Confirmation

of the Plan.

The schedules attached as Exhibit D to the Disclosure Statement detail the Debtor's projected data monthly for the year after confirmation and quarterly thereafter for five (5) years. The Debtor believes that, based upon the historical net cash flows, the Debtor will be able to make the distributions contemplated by the Plan and will be financially secure and will not need to seek further reorganization after confirmation.

### B. Risks

The Plan is subject to a number of material risks, including those enumerated below. Prior to deciding how to vote on the Plan, each holder of an impaired Claim and holder of an Interest should carefully consider all of the information contained in this Disclosure Statement, especially the factors mentioned in the following paragraphs.

#### 1. Certain Risks of Non-Confirmation

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of the distributions to non-accepting holders of Claims and Interests will not be less than the value of the distributions that such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that these requirements will be satisfied, there can be no assurance that the Court will concur. The confirmation and consummation of the Plan also are subject to certain conditions, which are described in Articles III and VIII of this Disclosure Statement.

If the Plan were not to be confirmed and consummated, it is unclear whether a reorganization comparable to the reorganization contemplated hereby could be implemented in a timely manner and, if so, what distributions holders of Claims and Interests ultimately would receive with respect to its Claims and Interests. Moreover, if an alternative reorganization could not be implemented in a timely manner, it is possible that the Debtor would have to liquidate its assets, in which case it is likely the holders of Claims and Interests would receive substantially less than they would have received pursuant to the Plan, and most probably, no distribution at all. See Article X of this Disclosure Statement.

#### 2. Potential Effects of a Prolonged Chapter 11 Proceeding

While management expects the Debtor's financial condition to improve over the next several months as its turnaround plan is fully implemented, it remains the case that prolonged Chapter 11 proceedings could have adverse effects on the Debtor, including the continuing strain on finance

from the continuing accrual of administrative expenses relating to the continuation of bankruptcy proceedings.

### 3. Risks Relating to the Projections

The management of the Debtor has prepared the projected financial information contained in Exhibit D to this Disclosure Statement (the "Projections") in connection with the development of the Plan to present the projected effects of the Plan and the transactions contemplated hereby. The Projections assume that the Plan and the transactions contemplated hereby will be implemented in accordance with its terms and are based upon numerous other assumptions and estimates. The assumptions and estimates underlying the Projections are inherently uncertain and are subject to significant business, economic, legal, and competitive risks and uncertainties that could cause actual results to differ materially from those projected. Accordingly, the Projections are not necessarily indicative of the future financial condition or results of operations of the Reorganized Debtor, which may vary significantly from those set forth in the Projections. Consequently, the projected financial information contained in this Disclosure Statement should not be regarded as a representation by the Debtor, the Debtor's advisors, or any other person that the Projections can or will be achieved.

### 4. Capital Requirements

The Debtor believes that the cash generated from ordinary-course operations will be adequate to support payment on the Debtor' Administrative Expense Claims, Priority Tax Claims, and Secured Claims; however, there can be no assurance that one or more unexpected necessary capital expenditures will not impact the Debtor materially and adversely, (e.g., fire, flood, or other natural disaster), and no assurance can be given that emergency financing will be available when needed and on reasonable terms.

### 5. Forward-Looking Information May Prove Inaccurate

This Disclosure Statement contains various forward-looking statements and information that are based on management's beliefs as well as assumptions made by and information currently available to management. When used in this document, the words "believe," "expect," "anticipate," and similar expressions are intended to identify forward-looking statements. Such statements are subject to certain risks, uncertainties, and assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected.

### 6. Competition and Economic Factors

This Disclosure Statement assumes that current economic conditions remain relatively unchanged. Any significant decrease in attendance at religious services by the Debtor, or any changes in the economic condition of the Debtor' usual or expected attendance base could have a negative affect on the Debtor and could affect the figures and projections presented in this Disclosure Statement.

### 7. Other Risk Factors

The Debtor's lease with Harmony Science Academy expires in September, 2017. Presently the lease pays ninety-nine thousand five hundred dollars ($99,579) per month to the Debtor and is the cornerstone of the Plan of Reorganization as it is the sole source of significant revenue with which to repay creditors and fund the Reorganization expenses. There have been no payment defaults since the Plan Confirmation in June 2010 and the Debtor believes that it has a good working relationship with the Lessee. The Debtor believes the current lease and tenant quality is the highest and best use for the property.

Harmony Science Academy is a charter school and is subject to regulation by the State of Texas. Although highly unlikely, it is possible that the State of Texas could impose restrictions on charter schools that would make it uneconomical for Harmony Science Academy to continue leasing the school space for almost $100,000/month.

Weekly tithes and offerings would not be sufficient for the Reorganized Debtor to fund all payments under the Plan of Reorganization. Attached as Exhibit F is a breakdown of the monthly church revenue and expense items. In 2012, the total tithes/offerings was _____. Income from tithes and offerings for 2013 is running behind the 2012 average. Costs associated with fund raising and costs related to operation of the church and charter school have not been deducted.

## X.    ALTERNATIVES TO PLAN

### A. Liquidation Analysis

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met. One of these requirements is that each non-accepting holder of an allowed Claim or Interest must receive or retain under the Plan, on account of such Claim or Interest, property as of the Effective Date of the Plan at least equal to the value such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

For purposes of the following discussion, it is assumed that a Chapter 7 trustee would seek to maximize the value of the estate by attempting to sell the assets of the Debtor as a going-concern. However, the Debtor believe that the circumstances surrounding a liquidation under Chapter 7 would inevitably lead to selling conditions that would substantially detract from the total value returned to the estate. Further, there is no assurance that a Chapter 7 trustee will sell the business, which would cause a forced liquidation at even more depressed prices. The following are some, but not all, of the deleterious consequences that the Debtor believe would result from a Chapter 7 liquidation:

- Substantial Chapter 7 administrative costs relating to professional fees, broker commissions, sales commissions and other associated expenses would necessarily be incurred.

- Conversion of the case to a Chapter 7 liquidation would adversely affect (I) morale, productivity, and retention of the Debtor' employees and; (ii) the willingness of the Debtor'

vendors to provide materials and services and extend credit.

- Adverse tax consequences may further reduce the value returned to the estate from a sale of the ongoing operations of the Debtor. An asset sale pursuant to a Chapter 7 liquidation could potentially result in adverse federal income tax consequences to the estate.

- A Chapter 7 trustee will be unfamiliar with the Debtor's religious activities and business operations at the time of his/her appointment and is not likely to be in a position to market the Debtor during the liquidation period as effectively as management.

Taking such matters into consideration, the Debtor has prepared the liquidation analysis set forth below as of December 2013. The conclusion of such analysis is that all holders of Claims other than holders of Secured Claims could expect a payment if the building sold quickly or zero dollars if the secured creditor obtained relief from the automatic stay to collect the lease payment and/or foreclose on the building. Furthermore, the Debtor expect that the Chapter 7 Trustee's process of winding-down the Debtor' affairs, objections to claims, and making dividends could take up to a year or longer. Thus, a dividend, if one is paid upon liquidation, would not likely be made until late in 2014 or later.

Estimated Recoveries of Claims Against the Debtor Upon Liquidation if Plan is Not Approved:

| | Iglesia Puerta Del Cielo, Inc. |
|---|---|
| | Liquidation Value of Assets/Liabilities |
| Cash | $27,000.00 |
| Tithes & Offerings | $20,000.00 |
| Real Estate* | $11,000,000.00 * after return of 16 acre parcel to Classes 3-6 |
| Leasehold Improvements | $28,530.25 |
| Computers & Software | $5,000.00 |
| Furniture & Fixtures | $82,500.00 |
| **GROSS ASSETS** | $11,236,030.25 |
| **LIABILITIES** (Priority & Unsecured) | $250,000.00 |
| **ECCU Indebtedness** | **$8,382,383.03** |
| **TOTAL LIABILITIES** | **$8,632,383.03** |
| **NET ASSETS REMAINING** | **$2,603,647.03** |

*Liquidation of the 12 acre improved real estate assumes a commercially reasonable arms length transaction, and not a foreclosure by ECCU, occurring less than 180 days after conversion to Chapter 7.

- •     Amount Available for Secured Claims  =    $861,030.25
- •     Amount Available after Secured Claims =   $ 786,030.25

### Chapter 7 Administrative Claims

- •     Chapter 7 Trustee Fees     =     ($20,000)
- •     Other Professional Fees    =     ($80,000)
- •     Total     =     ($100,000)

### Chapter 11 Administrative Claims

- •     Professional Fees = ($100,000)
- •     Amount Available for Claims Less Administrative Expenses = $861,030.25
- •     For Priority Tax Claims = $0
- •     Priority Non-Tax Claims = $ 0
- •     Amount Available for General Unsecured Claims = $2,603,647.03
- •     Amount Available for Interests = $2,603,647.03

      The foregoing analysis does not account for a possible deficiency claim by lenders after foreclosure.

### NOTES AND SIGNIFICANT ASSUMPTIONS UNDERLYING LIQUIDATION ANALYSIS

**Basis of Presentation** - The Debtor' liquidation analysis is based upon projected financial information adjusted to realizable values assuming liquidation of the Debtor by a trustee in a case under Chapter 7 of the Bankruptcy Code. The analysis assumes March 2014 liquidation and is based upon projected information applicable to that time period. The actual time required to effectuate a liquidation of the Debtor' assets would be longer and could be substantially greater.

**Cash and Cash Equivalents** - Cash and cash equivalents are presented at the amounts recorded in the books of the Debtor.

**Intangibles** - Intangible assets are assumed to have no value.

**Administrative Costs** - Administrative expenses are based on the Debtor' Chapter 11 Bankruptcy

Case through the projections. The fees of a Chapter 7 trustee are estimated under the formula of Section 326 of the Bankruptcy Code for compensation of trustees based on the liquidation value of the Debtor' assets. In addition, the trustee also would incur costs for professionals and selling commissions.

**Priority Claims** - The reflected priority claims consist primarily of pre-petition taxes and certain prepetition claims of employees. At present, no taxes are owed and no claims have been filed by taxing entities.

**Secured Claims** - Prepetition secured claims are included in the liquidation analysis at the amounts set forth in the Debtor' books and records as of the Petition Date and claims on file.

**Unsecured Claims** - Unsecured claims are based upon amounts recorded on the books and records of the Debtor and estimations of additional liabilities which may be allowed as part of the bankruptcy process, including disputed claims.

### B. Strategic Purchasers or Investors

The Debtor has exhausted all possibilities for obtaining, refinancing or new investors. None currently exist.

### C. Other Alternative Plans

The Debtor believes that to maximize the going concern value of the Debtor and, coincidentally maximize the return to creditors, the current Plan is the most desirable and beneficial plan to pursue.

### XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to the Debtor, and to holders of Claims and Interests. This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations thereunder, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement. Changes in these rules, or new interpretations of these rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

The material U.S. federal income tax consequences of the Plan are complex and subject to uncertainties. Except as provided herein, the Debtor has not requested a ruling from the IRS or an opinion with respect to any of the tax aspects of the Plan. There can be no assurance that the IRS will agree with this discussion of material federal income tax consequences. In addition, this summary does not address state, local, or foreign tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business

investment corporations, regulated investment companies, tax-exempt organizations, or investors in pass-through entities).

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR CREDITOR. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT ITS OWN TAX ADVISORS IN DETERMINING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES TO THEM IN CONNECTION WITH THE PLAN.

## A. Federal Income Tax Consequences to the Debtor

### 1. In General

The debt forgiveness income resulting from the satisfaction of claims at a discount should not constitute taxable income, although it will reduce tax attributes, such as net operating loss ("NOL") carryovers. The utilization of any NOL's remaining after application of the attribute reduction rules may be subject to limitations utilization of any NOL's remaining after application of the attribute reduction rules may be subject to limitations imposed by section 382 of the Internal Revenue Code.

### 2. Treatment of Debt Discharge Income Under the Plan

Pursuant to the Plan, the aggregate outstanding indebtedness of the Debtor will be substantially reduced. In general, section 61(a)(12) of the Internal Revenue Code provides that a taxpayer who realizes discharge of indebtedness income must include such income ("Debt Discharge Income") in taxable gross income. As a result of the Plan, the Debtor will realize a Debt Discharge if the fair market value of the property transferred by the Debtor to its Creditors for the benefit of its Creditors is less than the amount of Claims that such Creditors have against the Creditors for the benefit of its Creditors is less than the amount of Claims that such Creditors have against the Debtor. The Internal Revenue Code further provides in section 108(a)(1), however, that if a taxpayer is in a Title 11 case and the discharge of indebtedness is pursuant to a plan approved by a bankruptcy court, such Debt Discharge Income is not required to be included in gross income. However, section 108(b) of the Tax Code further provides that amounts so excluded from gross income will reduce certain tax attributes of the taxpayer, including NOL carryovers and the adjusted tax bases of assets. Debt Discharge Income will arise with respect to those Claim holders whose Claims are discharged by a payment of Cash or distributions of property with a value less than the face amount of the Allowed Claims. The Debt Discharge Income would equal the excess of the debt canceled over the Cash and fair market value of property received in exchange therefore. Regardless of the amount of Debt Discharge Income, there will be no taxable income recognized by the Debtor.

## B. Federal Income Tax Consequences to Creditors

### 1. In General

The tax consequences of the implementation of the Plan to a Claim holder will depend in part on (I) whether the Claim holder's Claim constitutes a security for federal income tax purposes, (ii) whether the Claim holder reports income on the accrual basis, (iii) whether the Claim holder receives consideration in more than one tax year of the Claim holder, (iv) whether the Claim holder is a resident of the United States, and (v) whether all the consideration received by the Claim holder is deemed to be received by that Claim holder as part of an integrated transaction. The federal tax consequences upon the receipt of Cash allocable to interest are discussed in "Tax Consequences to Claim holders - Receipt of Interest," below.

A Claim holder will recognize gain or loss on the exchange of his or her existing Claim (other than a Claim for accrued interest) for any consideration. The amount of such gain or loss will equal the difference between (I) the "amount realized" in respect of such Claim and (ii) the adjusted tax basis of the Claim holder in such Claim. Pursuant to section 1001 of the Tax Code, the "amount realized" will be equal to the sum of the Cash plus the fair market value of any other property received in such exchange.

A Claim holder who receives cash in full satisfaction of his or her Claim will be required to recognize gain or loss on the exchange. The Claim holder will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Claim holder in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth above.

In the case of a Claim holder whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss. In the case of a Claim holder whose existing Claim constitutes a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest. Any capital gain or loss recognized by a Claim holder will be long-term capital gain or loss with respect to those Claims for which the holding period of the Claim holder is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Claim holder is twelve (12) months or less.

### 2. Payments Attributable to Interest

Consideration attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Claim holder's existing Claims are capital assets in his hands and the exchange is pursuant to a tax reorganization. A Claim holder who, under his or her accounting method, was not previously required to include in income accrued but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for cash, other property or stock, or a combination thereof, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Claim holder realizes an overall gain or loss as a result of the exchange of his existing Claims. A Claim holder who previously was required to include in his or her taxable income any accrued but unpaid

interest on a Claim may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the Claim holder is less than the amount of interest taken into income by the Claim holder.

### 3. Backup Withholding and Information Reporting

Under the Internal Revenue Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding." Withholding generally applies if the holder: (I) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

### C. Federal Income Tax Consequences to Interest Holders

Pursuant to the Plan, all interests in the Debtor are retained subject to final payment to holders of Allowed Claims pursuant to the Plan.

**BECAUSE THE FINAL OUTCOME DEPENDS SO MUCH ON EACH INDIVIDUAL CLAIM HOLDER'S AND INTEREST HOLDER'S SITUATION, IT IS IMPERATIVE THAT EACH CLAIM AND INTEREST HOLDER SEEK INDIVIDUAL TAX COUNSEL FOR ADVICE ON HIS OR HER PARTICULAR SITUATION.**

### XII. MISCELLANEOUS PROVISIONS

As specified in section 1125(e) of the Bankruptcy Code, persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### XIII. CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtor' estates and the potential benefits that might accrue to holders of Claims against and Interests in the Debtor under the Plan as proposed. The Plan is the result of extensive efforts by the Debtor and its advisors to provide the Debtor's creditors with a meaningful dividend. The Debtor believes that the Plan is feasible and will provide each holder of a Claim against the Debtor with an opportunity to receive greater benefits than those that would be received by any other alternative available to the Debtor. **Therefore, the Debtor urges you to vote in favor of the Plan.**

Through confirmation of the Plan, the Debtor believe that it can resolve all Claims that have been, or could be, asserted against it in a timely and cost-effective manner. The Debtor believes that the Plan provides a mechanism to resolve and provide just compensation to all Claim holders. The Debtor believes that the Plan is fair to all parties-in-interest and should be approved by all persons entitled to vote.

Whether or not you expect to attend the Confirmation Hearing, which is scheduled for _____, 2014 at _:___.m. Mountain Time, you must sign, date, and mail, hand deliver, or fax your Ballot as soon as possible for the purpose of having your vote count at such hearing. All votes must be received by the Debtor' counsel, as indicated on the Ballot, on or before _:00 _m. **Mountain Time on _____, 2014.** Any Ballot that is unsigned, illegible or that fails to properly designate an acceptant or rejection of the Plan with an appropriate claim amount may not be counted as a vote in favor of the Plan.

DATED: November 14, 2013

Respectfully submitted,

JAMES & HAUGLAND, P.C.
609 Montana Ave.
El Paso, Texas 79902
Telephone: 915-532-3911
Facsimile: 915-541-6440

By:   /s/  Wiley F. James, III
       WILEY F. JAMES, III
       State Bar No. 10554300
       Attorney for Debtor

Iglesia Puerta Del Cielo, Inc.

By:   /s/ Marco A. Aguirre
      Marco A. Aguirre
      Its:  President